NEW PROSPECT DRILLING CO. *v.* FIRST COMMERCIAL TRUST, N.A. as Administrator of the Estate of Jolene Marie Jones, Deceased

97-615 966 S.W.2d 233

Supreme Court of Arkansas
Opinion delivered April 9, 1998

*Tatum, Rife & Tatum,* by: *Tom Tatum; Clevenger, Angel & Miller,* by: *Richard L. Angel;* and *Barrett & Deacon,* by: *D.P. Marshall, Jr.,* for appellant.

*Peel Law Firm, P.A.,* by: *Richard L. Peel,* for appellees.

DAVID NEWBERN, Justice. This is a negligence case resulting from an automobile-truck accident in which Jolene Marie Jones died. Ms. Jones was driving a Mercury Topaz that collided with a Ford Ranger pickup truck driven by Carl Lewallen and owned by Mr. Lewallen's employer, appellant New Prospect Drilling Co. ("New Prospect"). As the result of a jury's verdict, appellee First Commercial Trust, N.A. ("First Commercial"), administrator of Ms. Jones's estate, recovered $3 million in damages against New Prospect. New Prospect argues for reversal on account of jury misconduct and misconduct by First Commercial's attorney during the trial. It also contends that the Trial Court erred by allowing a deputy sheriff to give expert testimony and that the damages awarded were not supported by substantial evidence. We affirm the judgment as modified to reduce the damages by $100,000.

## 1. Expert testimony

The action was originally brought against Mr. Lewallen and New Prospect. A nonsuit was taken with respect to Mr. Lewallen. A trial began in June 1996. A mistrial occurred, and the retrial resulting in the verdict favoring First Commercial was held in January 1997.

The accident occurred on two-lane Pope County Road 81 north of London. Ms. Jones was westbound, and Mr. Lewallen was eastbound. The issue of fault depended upon whether one or both of the vehicles crossed the center line. Mr. Lewallen testified he had dropped his watch inside his truck and had pulled off on the shoulder to retrieve it. Having done so, he pulled back onto the road, and the wreck occurred shortly thereafter. He remembered nothing about how it happened, and there were no other eyewitnesses to the crash.

In the first trial, First Commercial presented the testimony of Pope County Deputy Sheriff Danny Sorey who investigated the accident. In response to questions about how the accident happened, Deputy Sorey said that the Ford pickup was found straddling the center line and that a skid mark, shown in photographs to have been in the westbound lane, came from the right front wheel of the pickup. Objections to that testimony were sustained on the basis that Deputy Sorey had not been qualified as an expert.

At the second trial, New Prospect sought a ruling that Deputy Sorey not be allowed to offer expert opinion testimony. In response, counsel for First Commercial stated he would "qualify" the witness by presenting evidence of his education and experience in accident investigation. New Prospect asked the Trial Court to review the record of the previous trial and to assure that the rulings on the questions would be the same. The Trial Court responded that he would hope to follow the same "line" but that he would have to hear the questions asked this time before ruling.

On direct examination, First Commercial's counsel, Richard Peel, asked Deputy Sorey a number of questions about his accident-investigation training at the law-enforcement academy. Deputy Sorey recalled having studied various aspects of accident

investigation and added that he had been investigating accidents for six years at the time this one occurred. He said he had benefitted from the experience of others, including state police officers, with whom he had worked accidents.

Mr. Peel asked Deputy Sorey if, "based on [his] education and experience in [his] investigation of this accident," he had an opinion as to which tire on the Ford pickup was skidding. As the skid mark in question went into the westbound lane of traffic, an answer that it was the right front tire of the truck would place the truck squarely in the oncoming lane of traffic in which Ms. Jones had the right of way. Counsel for New Prospect objected on the ground that "[t]he proper foundation has not been laid . . . nor is he qualified to render that opinion . . . ." The Trial Court overruled the objection. Deputy Sorey testified that it was the truck's right front tire and further opined, over further objection, that the wreck occurred in the westbound lane.

On cross-examination, New Prospect questioned the deputy's credibility. Deputy Sorey acknowledged and reiterated his deposition testimony in which he had said he was not an expert. He admitted that his drawings of the scene in front of the jury were different from his field-note drawings, which apparently suggested the wreck occurred in Lewallen's eastbound lane. He initially had the Topaz in the eastbound lane, but that was error, he said, and he made a second drawing to correct that mistake. He conceded that most of the truck was in the eastbound lane after the accident and that he had not noted in his field notes whether there were any gouge marks at the scene on the day of the accident. The marks had been covered, he explained, and did not become visible until later. The deputy conceded that he "never got underneath the Ford Ranger" and attempted to follow the skid marks to either tire.

Although the cross-examination was effective and perhaps raised some questions about the deputy's thoroughness in investigating the scene, the abstract does not show any motion from New Prospect to strike his testimony on the ground that his expert qualifications had been somehow disproved in view of what had come out on cross-examination.

Each side presented an expert accident reconstructionist to testify about who was responsible for the accident. Deputy Sorey was a second expert witness for First Commercial on the issue of who had caused the collision.

■■ New Prospect frames the issue as whether Sorey was properly declared an expert. Arkansas R. Evid. 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." We have held that, "[w]hether a witness may give expert testimony rests largely within the sound discretion of the trial court, and that determination will not be reversed absent an abuse of discretion. On appeal, the appellant must demonstrate that the trial court has abused its discretion." *Wade v. Grace*, 321 Ark. 482, 486, 902 S.W.2d 785, 788 (1995) (citations omitted).

■ In *Smith v. Davis*, 281 Ark. 122, 663 S.W.2d 165 (1983), we acknowledged that our prior cases had precluded police officers from giving opinions as to the causes of accidents. We recognized, however, that other jurisdictions held to the contrary. The holding of the case appeared as follows:

> We need not expand our decision beyond the facts of this case: Where an officer investigates a vehicle accident, observes sufficient relevant evidence such as skid marks, debris from the vehicles, position of the vehicles, or makes other observations, and where he can rationally form an opinion about the point of impact, he should be allowed to testify as to that opinion.
>
> It is for the trial court to determine whether proper foundation has been laid for the testimony. *See Gruzen v. State*, 276 Ark. 149, 634 S.W.2d 92 (1982); *Dixon v. State*, 268 Ark. 471, 597 S.W.2d 77 (1980).

*Id.* at 125, 663 S.W.2d at 166.

We have continued to hold in favor of allowing such opinions. In *Sledge v. Meyers*, 304 Ark. 301, 303-04, 801 S.W.2d 650, 651 (1991), we held that the Trial Court had erroneously prohibited the trooper from stating "her opinion about the location of

the vehicles at the moment of impact." We noted in the *Sledge* case that, in *Ferrell v. Southern Farm Bureau Cas. Ins. Co.*, 291 Ark. 322, 724 S.W.2d 465 (1987), "we expressly said a qualified trooper could state 'who crossed over a center line.'" *Sledge v. Meyers*, 304 Ark. at 303, 801 S.W.2d at 651.

█ Deputy Sorey testified about the kinds of things that appear to be permissible under the cases mentioned above. His testimony dealt with the point of impact: in what lane did the collision occur, and what tire on Lewallen's truck caused the skid mark? He detailed his academy training and work experience and described his investigation at the scene that led him to reach his conclusions. We have been cited to no authority holding that a law officer's modest refusal to declare himself an expert disqualifies the officer.

█ New Prospect makes much of the fact that the judge in the first trial sustained objections to Sorey's testimony. First Commercial's response is that Mr. Peel spent more effort in qualifying Deputy Sorey in the second trial than in the first and that there was more of a basis for determination. Again, we are cited to no authority suggesting that a judge in such a circumstance is prohibited from changing his ruling.

New Prospect also asserts that, even if Deputy Sorey was entitled to give an opinion on the basis of his credentials, his testimony still should have been stricken for lack of foundation. New Prospect points to the concessions made by Deputy Sorey during cross-examination regarding what he did and did not do during his processing of the accident scene. Based on the information elicited on cross-examination, New Prospect says there was no foundation for his conclusions. But New Prospect did not use the information elicited on cross-examination to make a "lack of foundation"-type motion to strike.

█ There was a foundation-based objection raised during direct examination. Prior to that time, however, Deputy Sorey had established that he had processed the scene; taken measurements; determined the vehicles' positions in the road; detected the skid marks; and searched for gouge marks, finding some then and others later. The foundation objection was properly denied at that

time. If New Prospect then wished to strike the testimony in light of its cross-examination, it should have said so then. As it stands, much of New Prospect's argument that Deputy Sorey's opinions lacked foundation are being raised for the first time on appeal. We do not reverse on the basis of arguments not raised in the trial court. *Slaton v. Slaton*, 330 Ark. 287, 294, 956 S.W.2d 150 (1997); *Jones v. Jones*, 320 Ark. 449, 898 S.W.2d 23 (1995).

### 2. *Attorney misconduct resulting in excessive verdict*

New Prospect cites numerous examples of alleged attorney misconduct that it argues led to the verdict of $3 million, which it considers to be excessive.

First, New Prospect complains about the opening statement of Mr. Peel in which he referred to the fact that the members of Ms. Jones's family had not reached "closure" with respect to the death of their seventeen-year-old daughter and sister and that they had to "deal" with her "death at the funeral and after."

■ New Prospect suggests that, in conjunction with later references by witnesses to the fact that the case had been tried once before, the opening-statement language suggested New Prospect was somehow at fault for delay. There were indeed some references by witnesses to the earlier trial. Most of them seemed to be inadvertent. From the record before us, we cannot say that the references created any prejudice toward New Prospect.

■ The second misconduct argument has to do with Mr. Peel's questioning of Don Johnston, who testified as an expert on behalf of New Prospect. On several occasions after Mr. Johnston made a statement on cross-examination, Mr. Peel asked if the jury was to "just take [his] word" for the truth of the statement. New Prospect attempted to inquire of Mr. Johnston whether Mr. Peel had asked that he serve as an expert for First Commercial in the case and thus to prove that Mr. Peel was questioning the trustworthiness of a witness he had previously attempted to procure for his client. The Trial Court refused to allow it on the ground that Mr. Peel would have to become a witness to refute any such evidence and that that would not be permitted. *See* Model Rule of Profes-

sional Conduct 3.7. New Prospect has not demonstrated that ruling to have been in error.

We do not mention all of New Prospect's allegations of misconduct, but there are two others we choose to discuss that were raised in New Prospect's motion for a new trial. First Commercial contends that Mr. Peel, at one point during the trial, said something like, "Those damn defense lawyers will argue with a wall all day long." The contention is that it was said in such a manner as to be audible to the jurors. Mr. Peel, in response, argued at trial that he did not use the word "damn" and that his remark was not overheard by the jury.

Finally, and perhaps most serious, there is a contention that Mr. Peel improperly appealed to the sympathy of the jurors in his closing argument. After Mr. Angel, arguing for New Prospect, had reminded the jurors of the Trial Court's instruction not to allow "sympathy" to enter their verdict, Mr. Peel, in rebuttal, agreed with that position but said, ". . . in cases like this if you measure a tremendous loss, you can't help but have some sympathy for them. You can't separate the two." Defense counsel's objection was sustained.

In support of its argument that the jury's verdict was affected by these instances of misconduct, New Prospect cites this language: "If the transgression be flagrant — if the offensive remark has stricken deep, and is of such a character that neither rebuke nor retraction can entirely destroy its sinister influence — a new trial should be promptly awarded . . . ." *German-American Ins. Co. v. Harper*, 70 Ark. 305, 307-08, 67 S.W. 755, 756 (1902). It is our view of the case that the instances of alleged misconduct on the part of Mr. Peel were not of the sort described in the quoted standard. Nor was it a situation such as we confronted in *Alexander v. Chapman*, 289 Ark. 238, 711 S.W.2d 765 (1986), where it appeared that counsel ran roughshod over the Trial Court's rulings. The responses of the Trial Court to the objections and the new-trial motion were within the Trial Court's discretion, and we have not been given sufficient reasons to reverse on the basis of counsel's misconduct.

### 3. Jury misconduct

After the closing arguments and instructions had been given, the jury retired to deliberate. The bailiff was summoned to the jury room and given a note apparently containing a question about damages. The Trial Court instructed the bailiff to take all the jury instructions to the jury. According to his affidavit, the bailiff entered the jury room to deliver the instructions and at that point observed two toy cars on the table in front of the jury foreman. The cars, which were sports-car models, were not part of the evidence he had delivered earlier to the jury room. The bailiff informed Judge Patterson that he believed "the jury was going to use the cars to reenact the accident." The bailiff was directed to bring the jury, along with the toy cars, into the courtroom. The bailiff returned to the jury room and saw that "all of the jurors were gathered around the foreman" and that "they were moving the cars around on the table."

The jury returned to the courtroom. Judge Patterson explained that they could not use the toy cars, which he retained and made a part of the record. In his statement denying the "drastic remedy" of a mistrial, the Trial Court said that he knew it was wrong for the jurors to have had the toy cars in their deliberations but that he saw "no harm in it."

The model cars were made one of the subjects of the motion for a new trial, and they were displayed during oral argument before this Court. New Prospect argues that, because of the differences in the configurations of the models from the actual vehicles — e.g., that the models did not have wheels that could be turned to emulate those of the car and truck involved in the wreck, that neither was a truck — the possibility of prejudice was great.

In response to New Prospect's new-trial motion, First Commercial filed twelve identical juror affidavits. Each of the affidavits provided, in relevant part, as follows:

> No extraneous, prejudicial information was improperly brought to the jury's attention during deliberations. No outside influence was improperly brought to bear upon any juror. The jury fore-

man, Kenneth Zelnick, did have two toy cars which were on the jury table. The cars were brought out after the jury had voted on the issue of liability and just before the jury sent out first note asking about damages. The cars were not considered on the issue of damages. Nothing about the presence or use of these two, small toy cars provided any information not introduced at trial or brought any outside influence to bear upon any juror. The jury foreman could as well have brought in two packs of cigarettes, two women's makeup compacts, two folded pieces of paper, two erasers, two shoes, or any two other items small enough to fit on the table. The fact that the objects on the table were miniature cars did not provide or demonstrate to the jury any information that was not presented as evidence at trial.

At a hearing on the new-trial motion, New Prospect moved to strike the affidavits on the ground that, "[o]n their face, they violate Rule 606(b) of the Arkansas Rules of Evidence." New Prospect called the jury foreman, Kenneth Zelnick, to the stand. He admitted that he produced the cars during jury deliberations. In questioning Mr. Zelnick, Mr. Angel, on behalf of New Prospect, made it clear that he did not wish to elicit testimony concerning either discussions in the jury room about the car or any impact the presence of the toy cars had on the jurors. He asked, however, what Mr. Zelnick had done with the model cars in the jury room. Mr. Zelnick said he "laid them on the table with the idea that they might help me or some of the other members of the jury to visualize how the cars may have been positioned on the road before and after the accident." First Commercial did not cross-examine Mr. Zelnick.

New Prospect then called juror Kathy Lloyd to the stand. She remembered that Mr. Zelnick produced the two cars during deliberations and put them on the table at an angle. Ms. Lloyd said that there was a picture of the accident scene in front of them and that Mr. Zelnick "set the toy cars like the cars were angled in the picture. That's about as long as they were in there. He sat the cars beside the picture. He didn't sit them directly on top of anything." Ms. Lloyd said that she did not believe Mr. Zelnick "moved the cars. He lined them up. I mean, he may have moved them by lining them up, but he did not move them by rolling

them around." First Commercial did not cross-examine Ms. Lloyd.

The Trial Court struck the juror affidavits with the exception of the portions that read,

> The jury foreman, Kenneth Zelnick, did have two toy cars which were on the jury table. The cars were brought out after the jury had voted on the issue of liability and just before the jury sent out its note about damages. The cars were not considered on the issue of damages.

After further discussion about Rule 606(b) and the "reasonable possibility of prejudice" standard to be applied, the Trial Court denied the new-trial motion and said that the "allegation concerning misconduct of the jury and the evidence pertaining thereto did not affect the substantial rights of the parties to this action."

In *Diemer v. Dischler*, 313 Ark. 154, 160, 852 S.W.2d 793, 796 (1993), a motion for a new trial was made on the basis of juror affidavits to the effect that two jurors had gone to the scene of the accident that was the subject of the trial and had experimented with respect to whether a car could be brought to a stop within a certain distance. The affidavits indicated that the two jurors had revealed their experiment and its result to the others. Citing *Borden v. St. Louis Southwestern Ry. Co.*, 287 Ark. 316, 698 S.W.2d 795 (1985), and *St. Louis Southwestern Ry. Co. v. White*, 302 Ark. 193, 788 S.W.2d 483 (1990), we held the standard to be applied was whether the jurors' misconduct created a reasonable possibility of prejudice, but we stated that on review we reverse the denial of a motion for a new trial only if there has been a manifest abuse of discretion. We held there had been no such abuse of discretion.

We reach the same conclusion in this case. The use of the toy cars, brought to the jury room for the purpose of a demonstration, comes close to the bringing in of extraneous evidence, and we agree it should not have occurred. That, however, is not the same as saying that a jury may not use "props" to reenact an event. While we conclude that it was improper for a juror to have brought the toy cars into the jury room, it seems a close question

because we would clearly have found no impropriety had the jurors used two items they might have found at hand, such as pencils or erasers, or perhaps books, to demonstrate their views to each other on how the accident occurred.

Even though the Trial Court indicated he found no "actual prejudice," rather than reciting the "reasonable possibility of prejudice" standard, we cannot say his overruling of the new trial motion was a manifest abuse of discretion. The evidence given by the bailiff and that of the jurors conflicted. A juror said the toy cars were placed on the table in the jury room and were moved to relative positions occupied by the damaged cars in one of the photographs in evidence. The Trial Court need not have believed the cars were used in a full-blown reenactment of the crash or that, if such a reenactment had occurred, any juror might possibly have disregarded the fact that the toy cars did not resemble the vehicles involved in the wreck.

New Prospect contends on the one hand that the toy cars were so different from the ones involved in the wreck that it was improper to use them. On the other hand, it contends that the toy cars were too similar to the ones involved, in comparison with items such as books or pencils, and thus misleading as they did not have some of the characteristics of the vehicles involved in the crash, such as the height of the truck and wheels that turn. To hold that the toy cars were so much like the vehicles involved in the wreck and yet were so different that there was a reasonable possibility of prejudice, and thus a manifest abuse of discretion in denying a new trial, would ignore the common sense possessed by jurors and commonly exercised by them in viewing the evidence presented.

In *United States v. Abeyta*, 27 F.3d 470 (10th Cir. 1994), a juror used his personal pocket knife to reenact a crime during jury deliberations. In reaching the conclusion that there was no constitutional violation, the Court noted that there was "simply no constitutional command preventing a jury from using common sense and ordinary and uninflammatory props to reenact a crime in the privacy of the jury room." *Id.* at 477. Obviously we do not cite

the case for its constitutional-law aspect but as reinforcement of our view that jurors would not be misled by the "props."

 In view of the clear evidence as to the nature of the vehicles involved in this case and the obvious differences between them and the toy cars, we cannot say that there was any reasonable possibility of prejudice resulting from their presence in the jury room or that there was an abuse of discretion in the denial of the new-trial motion.

### 4. Damages

#### a. Conscious pain and suffering

New Prospect contends that the damages award should shock the conscience of the Court and cause a new trial. It first complains about the $1,000,000 awarded for conscious pain and suffering by the decedent. The contention is that the evidence that Ms. Jones was conscious and suffering after the accident was tenuous and that the amount of the award must have been based on the misconduct of counsel causing prejudice on the part of the jury.

Susan Humphrey testified that she arrived on the scene of the accident prior to the police and the emergency medical personnel. Part of Ms. Humphrey's testimony, as abstracted, follows:

> I went over to the car. Her head was bent over funny and she had blood coming out of her mouth. There was blood on her arms. I kept telling her to hold on, that the police and the paramedics had been called and would be there soon and God loved her. At some point she was moving her arms. I'm not sure why, but I told her to stop moving because she might hurt herself. At some point the blood stopped coming out of her mouth. She must have been swallowing it, because her breathing got really bad. It was hoarse and raspy. When I told her to stop moving, she did. She quit moving her arms and was still for me. Then when her breathing got really bad, I'd tell her to take a deep breath, and she would take a deep breath. Then she would go back to the shallow, raspy breathing. I'd tell her to take another deep breath a few seconds later and she would breathe again . . . . I had the definite impression that I was able to communicate with her . . . . When I told her to quit moving, it was like, "OK, I've got your attention. You know, I can hear," and

she would quit moving. It was like she was trying to let me know she could hear me or something.

In view of that testimony, we cannot say the evidence was insufficient to show that there was conscious pain and suffering on the part of Ms. Jones or that the damage award in that respect shocks the conscience of the Court.

### b. Awards to siblings absent evidence of grief

The award of damages was apportioned by the jury among the family members of the decedent. New Prospect argues that the $50,000 awards made to Russell E. Jones and Rebecca McKinney should be reversed because neither testified at the trial and no other witness presented evidence of mental anguish on the part of either of them. We agree.

First Commercial argues that we can affirm the two awards, as Act 589 of 1993 (Ark. Code Ann. § 16-62-102 (Supp. 1997)) permits recovery by a family member of a decedent for "grief normally associated with the loss of a loved one." Our cases decided prior to Act 589 have required something more than "normal" grief. *See Peugh v. Oliger*, 233 Ark. 281, 345 S.W.2d 610 (1961), overruled on other grounds, *Fountain v. Chicago, R.I. & Pac. Ry.*, 243 Ark. 947, 422 S.W.2d 878 (1968).

We are not concerned here with the extent to which the statute may have changed the law as to the extent to which grief must be demonstrated, but with whether it must be demonstrated to some degree. Absent some such evidence from or on behalf of Ms. McKinney and Mr. Jones, we cannot uphold the judgments in their favor.

First Commercial has agreed in its brief that, if Act 589 is not to be interpreted as permitting damages to Mr. Jones and Ms. McKinney in this case, their awards may be remitted. We modify the judgment by removing those awards, thus reducing the total recovery by $100,000.

Affirmed as modified.