Diann K. DODSON (Douglas) and Ruthie Drain,
Administratrix of the Estate of Freddie Drain *v.* CHARTER
BEHAVIORAL HEALTH SYSTEM of NORTHWEST
ARKANSAS, INC. d/b/a Charter Vista Hospital; and
The Estate of Tammy Harrison (Butts)

97-1427                                983 S.W.2d 98

Supreme Court of Arkansas
Opinion delivered November 12, 1998

*Jeff Slaton* and *Odom & Elliott*, by: *J. Timothy Smith*, for appellant Ruthie Drain.

*Todd L. Griffin*, for appellant Diann K. Dodson.

*Bassett Law Firm*, by: *Woody Bassett*, for appellee.

*Prior, Barry, Smith , Karber & Alford, PLC*, by: *Ben T. Barry* and *Jacqueline J. Johnston*, for appellee/cross-appellant.

R OBERT L. BROWN, Justice. This is an appeal from a grant of a motion for a directed verdict in favor of appellee Charter Behavioral Health System of Northwest Arkansas, Inc. d/b/a Charter Vista Hospital (Charter Vista). Appellee/ cross-appellant The Estate of Tammy Harrison (Butts) cross-appeals on the failure of appellants Diann K. Dodson (Douglas) and Ruthie Drain, Administratrix of the Estate of Freddie Drain, who filed the complaint in this matter, to comply with the Statute of Non-Claim of the Probate Code (Ark. Code Ann. § 28-50-101(a) (Supp. 1997)). We affirm the directed verdict in favor of Charter Vista. We reverse the trial court's ruling with regard to the cross-appeal and Statute of Non-Claim and hold that the claims of Dodson and the Drain Estate against the Harrison Estate are barred.

From March 9, 1994, to March 21, 1994, Tammy Harrison was an in-patient at Charter Vista Hospital in Fayetteville. Her diagnosis was severe depression, and she was placed on a suicide watch. According to a Psychiatric Evaluation completed by Dr. Stephen Dollins on March 9, 1994, she had suicidal ideations with a plan of driving in front of a truck to make her death look like an accident.

When Harrison was discharged from Charter Vista on March 21, 1994, she was directed to have counseling at the Ozark Guidance Center, also in Fayetteville, but this was not done because her health insurance would not cover the treatment. She did, however, attend ten aftercare group sessions at Charter Vista, the last being on June 23, 1994, which was the date of her death. Dr.

Stephen Dollins also provided follow-up care and saw her on three occasions after her discharge from the hospital. Her last appointment with him was on May 24, 1994, when, according to his records, she appeared to be doing fine.

On June 23, 1994, Harrison attended an aftercare group session at Charter Vista led by counselor Judy Bostian. Her wrists had been cut, and she stated that she had thoughts of suicide. She was kept after the group session so that she could visit with Bostian but left at 8:30 p.m., with instructions from Bostian to call if she had thoughts of harming herself. At 10:15 p.m. that same night, Harrison called Charter Vista and spoke with Rochelle Knox, who assessed her as suicidal. Knox contacted the Mobile Assessment Team (MAT), which is part of the Charter Vista operation and which was created for the purpose of going to locations and assisting in psychiatric emergencies. When Harrison could not be reached at the number she had given, Knox called the Fayetteville Police Department and asked that they do a welfare check on Harrison. At 10:46 p.m., Harrison called Charter Vista, and because contact was reestablished, Knox canceled the police welfare check.

Juliette Minkel, a MAT member on duty with Charter Vista, spoke with Harrison for 45 minutes after she called back. Harrison told her that she was having problems coping with four children under three years old, including one-year-old twins. Also, her husband had recently left her. Harrison stated that she had cut her wrists earlier in the day because she wanted to hurt herself and her friend had put a Band-Aid on the injury. Based on the conversation, during which Harrison told Minkel that she did not want to die, Minkel determined that the earlier incident of cut wrists was self-mutilation and not a genuine suicide attempt. She stated that Harrison seemed to be functioning fully and was rational, and further that she appeared to be seeking the help she needed. Harrison agreed to come to Charter Vista at midnight. Minkel testified that she called Dr. Dollins, who agreed with the plan. (Dr. Dollins, however, testified that Minkel called him *after* Harrison's death.)

While driving on State Highway 265 toward Charter Vista, Harrison crossed the centerline and struck a vehicle, injuring Debra Middleton. Further up Highway 265, she again crossed the centerline and struck a vehicle head-on. The driver of the car, Freddie Drain, was killed, and the passenger, Diann Dodson, was injured. Harrison was killed when her car caught fire as a result of the collision. The Medical Examiner's Office performed an autopsy and rendered an opinion that Harrison's death was due to suicide.

Diann Dodson sued the Estate of Tammy Harrison, Charter Vista, and Dr. Stephen Dollins and claimed negligence. Ruthie Drain, Administratrix of the Estate of Freddie Drain, intervened as a plaintiff against the same parties. Both complaints against Dr. Dollins were dismissed without prejudice pursuant to Ark. R. Civ. P. 41. Charter Vista then filed a cross-claim seeking contribution and proration of fault against the Estate of Harrison, and the Estate of Harrison did likewise against Charter Vista. The trial court allowed Progressive Insurance Company, the liability carrier which had insured Tammy Harrison, to interplead its policy limits of $50,000 into the Registry of the Court for distribution to the proper parties.

Charter Vista filed a motion for summary judgment with regard to the claims of Dodson and the Drain Estate and argued that it owed no duty to Dodson or Drain because it did not have a special relationship with Harrison at the time of her suicide and, thus, had no control over her. Charter Vista further asserted that the incident was not foreseeable, and that Dodson and Drain could not have been identified as potential victims even if there had been a duty to warn. The Harrison Estate also filed a motion for summary judgment against the plaintiffs, Dodson and the Drain Estate, and defendant Charter Vista and argued that their claims were barred by the Statute of Non-Claim because the claiming parties had not filed a claim in the probate estate within six months of publication of notice of the opening of the estate.

The trial court denied Charter Vista's motion for summary judgment and concluded that the hospital did owe a duty to Dodson and Drain. The trial court denied the Harrison Estate's

motion under the Statute of Non-Claim and permitted the claims of Charter Vista, Dodson, and Drain to be considered as claims against the Harrison Estate. The case proceeded to trial. On the fourth and final day of the trial, the trial court granted Charter Vista's directed-verdict motion on the basis that Dodson and the Drain Estate had failed to prove that Charter Vista's actions were the proximate cause of Dodson's injuries and Drain's death. The jury awarded Dodson and the Drain Estate $802,000 against the Estate of Harrison.

## I. *Directed Verdict*

Dodson and the Drain Estate first contend that the trial court erred in converting the appellants' case from an ordinary negligence case to a medical negligence case. They point to the fact that the trial court entered an order denying Charter Vista's summary-judgment motion before trial and that the trial court had specifically referred to the hospital's duty of ordinary care during discussions surrounding that order. Finally, they maintain that the trial court's pretrial order was an order under Arkansas Civil Procedure Rule 16, which controlled the course of the ensuing trial.

We disagree, as an initial matter, that the trial court's order of March 11, 1997, was a Rule 16 order. Rather, the order primarily (a) denied Charter Vista's motion for summary judgment against Dodson and the Drain Estate, (b) granted Charter Vista's motion to dismiss against the Harrison Estate, and (c) denied the Harrison Estate's motion for summary judgment against Dodson and the Drain Estate. The order also dealt with a continuance motion and motion *in limine*. A Rule 16 order is categorically different. It generally concerns stipulations and agreements by the parties which narrow the issues, exhibits, and witnesses for trial. This aspect of the appellant's argument is meritless.

The crux of the argument made by Dodson and the Drain Estate is that they pled ordinary negligence against Charter Vista and that the trial court only alluded to a duty of ordinary care owed by Charter Vista prior to trial. They add that the case was tried as an ordinary negligence case. Again, we disagree. Medical

negligence permeates this case. Indeed, in their complaint, Dodson and the Drain Estate allege negligence and proximate causation against Charter Vista which is grounded on the hospital-patient relationship between Charter Vista and Harrison. For example, the complaint alleges:

- Charter Vista should have known about Harrison's suicide plan.
- Charter Vista failed to get either the MAT or the Fayetteville police to check on its patient.
- Charter Vista encouraged Harrison to drive when they should have known of her suicide plan.
- Charter Vista had no policies in place to assess when a patient may pose a danger to herself or third parties.

All of these allegations are centered on a breakdown in medical care between the hospital and its patient.

It is true that the trial court made a reference to the duty of ordinary care owed by Charter Vista to Harrison before trial. That was in the context of assessing Charter Vista's motion for summary judgment and deciding whether a special relationship existed between the hospital and Harrison under *Keck v. American Employment Agency, Inc.*, 279 Ark. 294, 652 S.W.2d 2 (1983), to control Harrison's conduct with respect to others. The trial court found that there was a special relationship and that a duty was owed, but we do not view that finding as determinative of whether this is a medical negligence case.

Dodson and the Drain Estate claim, nevertheless, that they were misled by the trial court into believing this was an ordinary negligence case and were caught up short during the trial when they became aware that the medical negligence burden of proof had to be met. We fail to see how this could be the case. Our Medical Malpractice Act defines "medical injury" expansively:

"Medical injury" or "injury" means any adverse consequences arising out of or sustained in the course of the professional services being rendered by a medical care provider, whether resulting from negligence, error, or omission in the performance of such services; or from rendition of such services without informed consent or in breach of warranty or in violation of contract; or

from failure to diagnose; or from premature abandonment of a patient or of a course of treatment; or from failure to properly maintain equipment or appliances necessary to the rendition of such services; or otherwise arising out of or sustained in the course of such services.

Ark. Code Ann. § 16-114-201(3) (1987). This court has acknowledged the broad scope of this definition. *See, e.g., Adams v. Arthur*, 333 Ark. 53, 969 S.W.2d 598 (1998); *First Comm. Trust Co. v. Rank*, 323 Ark. 390, 915 S.W.2d 262 (1996). Surely, failure to diagnose Harrison as suicidal and to provide proper services to prevent her death lay at the heart of the appellants' cause of action.

■ But in addition to that, the facts belie that Dodson and the Drain Estate were misled when told that this was a medical negligence case. Dr. Alan Tuft, a psychologist who practices in Rogers, was called as an expert witness for the Drain Estate as part of its case in chief. After being qualified as an expert, Dr. Tuft explained that he had reviewed the records and depositions in this case and then answered affirmatively when he was asked if the opinions that he was going to give would be based on the standard of care in this, or a similar, locality. That is precisely what an expert witness testifies to in order to meet the burden of proof in a medical malpractice case. *See* Ark. Code Ann. § 16-114-206(a) (1987). Added to this is the fact that during the direct examination of Dr. Tuft, the trial court conducted an *in camera* discussion where the trial court specifically stated that Charter Vista had been sued for a medical injury.

■ We turn then to the question of whether Dodson and the Drain Estate presented substantial evidence so as to avoid a directed verdict against them. When considering a motion for directed verdict made by a defendant, the plaintiff's evidence, and all reasonable inferences therefrom, are examined in the light most favorable to the plaintiff. *See Avery v. Ward*, 326 Ark. 829, 934 S.W.2d 516 (1996). A directed-verdict motion should be granted only if the evidence would be so insubstantial as to require a jury verdict for that party to be set aside; evidence is insubstantial when it is not of sufficient force or character to compel a conclusion one way or the other, or if it does not pass beyond mere suspicion or

conjecture. *See City of Little Rock v. Cameron*, 320 Ark. 444, 897 S.W.2d 562 (1995); *St. Paul Fire & Marine Ins. Co. v. Brady*, 319 Ark. 301, 891 S.W.2d 351 (1995).

■ ■ To establish a *prima facie* case of negligence, a plaintiff must show that damages were sustained, that the defendant breached the standard of care, and that the defendant's actions were the proximate cause of the damages. *See Union Pac. R.R. Co. v. Sharp*, 330 Ark. 174, 952 S.W.2d 658 (1997). Proximate cause is "that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." *Union Pac. R.R. Co. v. Sharp, supra; Craig v. Traylor*, 323 Ark. 363, 915 S.W.2d 257 (1996). Thus, a plaintiff must show causation in fact and legal causation. When there is evidence to establish a causal connection between the negligence of the defendant and the damage, it is proper for the case to go to the jury. *See McGraw v. Weeks*, 326 Ark. 285, 930 S.W.2d 365 (1996). But proximate causation becomes a question of law if reasonable minds could not differ as to the result. *See Union Pac. R.R. Co. v. Sharp, supra; Tyson Foods Inc. v. Adams*, 326 Ark. 300, 930 S.W.2d 374 (1996).

■ The burden of proof for a plaintiff in a medical malpractice case is fixed by statute. *See* Ark. Code Ann. § 16-114-206(a) (1987). The statute requires that in any action for a medical injury, expert testimony is necessary regarding the skill and learning possessed and used by medical care providers engaged in that speciality in the same or similar locality. Thus, it was incumbent on Dr. Tuft to offer evidence in the form of his opinion that Charter Vista had violated the standard of care for medical care providers in the locality for the speciality involved. We agree with the trial court that Dr. Tuft's opinions failed to cross this essential bridge. Examples of Dr. Tuft's answers during cross-examination by Charter Vista's counsel follow:

> ATTORNEY: Okay. It's fair to say, is it not, Dr. Tuft, that you are not in any way critical of the way in which Julie Minkel did her job on the night of June the 23rd, 1994?
>
> DR. TUFT: That is correct.
>
> ATTORNEY: She didn't do anything wrong, did she?

DR. TUFT: Not that I could tell from her deposition, no.

ATTORNEY: She handled the phone call very well and very professionally, didn't she?

DR. TUFT: As best I can tell, yes.

. . . .

ATTORNEY: It was perfectly proper and reasonable for Julie Minkel to agree to meet Tammy Harrison at Charter Vista Hospital that night, wasn't it?

DR. TUFT: As best I can tell, yes.

ATTORNEY: And it's perfectly reasonable for Julie Minkel to not be concerned about Tammy Harrison driving to Charter Vista Hospital that night, isn't it?

DR. TUFT: As best as I can tell.

. . . .

ATTORNEY: You are not critical in any way, are you, Dr. Tuft, of Dr. Dollins in what he may have done in regard to his treatment of Tammy Harrison?

DR. TUFT: The only area, and again I do not know who or how it should have been dealt with, is in the area of availability of information back and forth between the various people at Charter, between each other. But as far as his treatment per se, no, I am not critical of it.

ATTORNEY: Okay. As far as you can tell in reviewing the records, he offered her excellent treatment, didn't he, at all times?

DR. TUFT: Yes sir.

ATTORNEY: Let me go back to the question I just asked you a minute ago. And I think you hedged a little on me, and that's why I want to come back to this. I want to nail down something with certainty. Are you, or are you not, in any way critical of Dr. Dollins insofar as his treatment of Tammy Harrison at any time, either while she was in the hospital or during the three months or so after she was out of the hospital?

DR. TUFT: No.

ATTORNEY: You're not critical.

DR. TUFT: That is correct.

. . . .

ATTORNEY: Dr. Tuft, what it comes down to on the night of June 23rd is Julie Minkel assessing Tammy Harrison over the phone and then making a decision on what she should do; right?

DR. TUFT: That is correct.

ATTORNEY: And the decision for further assessment of Tammy Harrison at the hospital was a good decision, wasn't it?

DR. TUFT: Seemed to be. Yes.

ATTORNEY: That's what you would've done had you been in her shoes, isn't it?

DR. TUFT: Most probably.

. . . .

ATTORNEY: In reality, Doctor, it's your opinion, is it not, that Charter Vista Hospital provided good and professional care, both on an inpatient and outpatient basis to Tammy Harrison?

DR. TUFT: I believe that in general they did, yes. With the one area of exception and that is the flow of information between the people treating her.

Thus, Dr. Tuft had no problem with the services rendered to Harrison by Charter Vista. The one area where Dr. Tuft had a question related to how the medical information about Harrison was passed among Charter Vista personnel.

On the point of record circulation, it was the responsibility of Dodson and the Drain Estate to offer evidence that better sharing of records would have prevented the accident. This, they failed to do. Juliette Minkel, then a licensed associate counselor with MAT, spoke with Harrison for 45 minutes and was fully apprised of her condition vis-à-vis suicide ideation. Dr. Dollins, of course, had been her treating physician. Dr. Tuft in no way testified that providing additional information contained in other records to either one of these people would have prevented the accident. Indeed, he was not critical of the way either person handled the matter.

▮ Again, evidence must rise above mere conjecture and suspicion to be substantial. *See City of Little Rock v. Cameron, supra.* We conclude that Dr. Tuft's opinion testimony failed to meet this necessary criterion.

## II. New-Trial Motion

In a similar vein, Dodson and the Drain Estate maintain that they were denied a fair trial due to surprise and procedural irregularities. This, again, related to their burden of proof and whether this was a medical negligence case. They moved for a new trial under Ark. R. Civ. P. 59(a)(1) and (a)(3). For reasons already stated, we disagree that the appellants were either surprised or that procedural irregularities afflicted the trial of this matter.

It is true that the trial court stated at the new-trial hearing that he wished he had never used the term "ordinary care" as part of the ruling on Charter Vista's motion for summary judgment. But that is a far cry from an admission that the appellants were misled or surprised concerning the fact that a medical injury was involved or what comprised their burden of proof.

▮ The trial court did not abuse its discretion in denying the motion for a new trial. *See New Prospect Drilling Co. v. First Comm. Trust,* 332 Ark. 466, 966 S.W.2d 233 (1998).

## III. Statute of Non-Claim

We turn next to the cross-appeal by the Harrison Estate which relates to the trial court's denial of the Estate's motion for summary judgment. The Estate's motion was premised on the Statute of Non-Claim and the failure of Dodson and the Drain Estate to file a claim against the Estate within the requisite six-month period. The trial court denied the motion. We hold that the trial court erred in this regard, and we reverse on cross-appeal.

In 1989, the General Assembly amended the limitation period for filing claims against a probate estate. *See* 1989 Ark. Acts 929 (codified at Ark. Code Ann. § 28-50-101 (Supp. 1997)).

Under Act 929, the last sentence was added to the Statute of Non-Claim, which now reads as follows:

> (a) *Statute of Nonclaim.* Except as provided in §§ 28-50-102 and 28-50-110, all claims against a decedent's estate, other than expenses of administration and claims of the United States which, under valid laws of the United States, are not barrable by a statute of nonclaim, but including claims of a state or territory of the United States and any subdivision thereof, whether due or to become due, absolute or contingent, liquidated or unliquidated, founded on contract or otherwise, shall be forever barred as against the estate, the personal representative, or the heirs and devisees of the decedent, unless verified to the personal representative or filed with the court within three (3) months after the date of the first publication of notice to creditors. However, claims for injury or death caused by the negligence of the decedent shall be filed within six (6) months from the date of first publication of the notice, or they shall be forever barred and precluded from any benefit in the estate.

Ark. Code Ann. § 28-50-101(a) (Supp. 1997).

With regard to the tort claims, section (f) of § 28-50-101 was unchanged by Act 929 :

> (f) *Certain Tort Claims Not Affected.* Notwithstanding the foregoing provision relating to the time for filing claims against an estate, or any other provisions of this code, a tort claim or tort action against the estate of a deceased tortfeasor, to the extent of any recovery which will be satisfied from liability insurance or from uninsured motorist insurance coverage and which will not use, consume, or deplete any assets of the decedent's estate, may be brought within the limitation period otherwise provided for the tort action. No recovery against the tortfeasor's estate shall use, consume, diminish, or deplete the assets of the decedent's estate, and any recovery shall not affect the distribution of the assets of the estate to the heirs, next of kin, legatees, or devisees of the deceased tortfeasor unless a claim is filed in the manner and within the time provided by this code for filing claims against the estate.

Ark. Code Ann. § 28-50-101(f) (Supp. 1997).

The appellants did not file a claim against the Harrison Estate relating to their injury and death but rather filed their negligence actions against the Estate in circuit court. Dodson did, however, serve the administrator of the Harrison Estate with her complaint in circuit court within 90 days of the first publication of notice. In response, the Harrison Estate interpled the policy limits of $50,000 from Harrison's liability carrier, Progressive Insurance company. Ruling on the Harrison Estate's motion from the bench, the trial court stated that the Statute of Non-Claim only required that notice be given to the estate's administrator and did not require the actual filing of a claim against the Estate. The statute was satisfied, according to the trial court, by filing the negligence complaint in circuit court and by serving the Estate. We disagree.

██ ██ In interpreting statutes, we give the words their plain, customary, and ordinary meaning. *See Leathers v. Cotton*, 332 Ark. 49, 961 S.W.2d 32 (1998); *Munson v. State*, 331 Ark. 41, 959 S.W.2d 391 (1998). The Statute of Non-Claim requires that ordinarily claims against an estate must either be *verified* to the personal representative or *filed* with the probate court within three months of the first publication of notice. Act 929 of 1989 added a sentence to the statute, and the meaning of the sentence is absolutely clear. Injury and death claims must be *filed* with the estate within six months from the date of the first publication of notice in order for the probate estate to be liable. Otherwise, they are barred. The General Assembly obviously wanted to make certain that claims for injury and death were actually filed with the probate court within the sixth-month period to give a clear cut off date for such claims and to enable the personal representative to close the estate, if feasible. Tort claims under § 28-50-101(f), however, which will be satisfied from liability insurance and not estate assets may be *brought* within the limitation period for torts.

██ Clearly, no claim was filed in the Harrison Estate for Dodson's injury or Drain's death. Because of this, those claims against the estate's assets which are represented by the complaints in tort and the judgment are barred. The judgment in this case,

however, may be partially satisfied from the interpled proceeds from the liability policy. We reverse the summary judgment order on this point and remand for an order consistent with this opinion.

Affirmed in part. Reversed in part and remanded.

NEWBERN, J., not participating.

GLAZE, J., dissents.

TOM GLAZE, Justice, dissenting in part. On November 8, 1994, the Estate of Tammy Harrison gave its first publication of notice of appointment of personal representative. Under Ark. Code Ann. § 28-40-111(a)(4) (Supp. 1997), a copy of the notice must also be served upon all unpaid creditors whose names, status as creditors, and addresses are known to or reasonably ascertainable by the personal representative. The burden of proof of any issue as to whether a creditor was known to or reasonably ascertainable by the personal representative shall be upon the creditor claiming entitlement to such actual notice. *Id.* Moreover, § 28-40-111(a)(1) provides that any claim for injury or death caused by the negligence of the decedent shall be filed within six months from the first publication date. *See also* Ark. Code Ann. § 28-50-101 (Supp. 1997). Here, that would be six months from November 8, 1994.

Diann Dodson filed her negligence suit against the Harrison Estate on December 14, 1994, or well within the six-month period. On March 9, 1995, the Drain Estate sent its complaint and motion to intervene to the Harrison Estate's counsel, which was in compliance with the Harrison Estate's published notice. The Harrison Estate offered no objection to the Drain Estate's intervention. Apparently, the majority court holds that Dodson and Drain were not entitled to actual notice because they were not ascertainable as unpaid creditors, and that Dodson's and Drain's negligence claims were untimely because they were not filed in probate court. I disagree with both holdings.

Ark. Code Ann. §§ 28-40-114 and 28-50-101 (1987 and Supp. 1997, respectively) provide that persons with negligence claims must file them within six months from the first publication-of-notice date, and like the trial court, I believe Dodson and Drain complied with those provisions. In other words, the Harrison Estate was fully apprised of Dodson's and Drain's claims. The fact that the two claims were not filed in probate court, as such, is of no consequence, especially since those pertinent statutes fail to require those negligence claims to be filed in probate court. After all, probate courts act with limited authority, and in this situation, the statutes only provide that injured persons file their negligence claims within six months from the date of first publication, which Dodson and Drain did. *See Estate of Wood v. Arkansas Dep't of Hmn. Serv.*, 319 Ark. 697, 894 S.W.2d 573 (1995); *In Re: Estate of Jones*, 317 Ark. 606, 879 S.W.2d 433 (1994).

In addition, I note that, from the time the Harrison Estate was opened, the Estate was fully aware of Harrison's alleged negligence that caused Dodson's injury and Drain's death. In my view, Dodson and Drain's Estate should have been served with actual notice that the Harrison Estate had been opened. *See* Ark. Code Ann. § 28-40-111(a)(4). In any event, all three of these parties had notice and information regarding their respective claims and defenses well within the six-month period provided for under §§ 28-40-111 and 28-50-101. As a consequence, the purpose of Arkansas's probate-notice provisions were met, and I believe it is unfair to cut short Dodson's and Drain's negligence claims by adding the words "probate court" into the statutory provisions that only read to say such claims "shall be filed" within the required six-month period.