TYSON FOODS, INC. *v.* Steve ADAMS

95-969                                         930 S.W.2d 374

Supreme Court of Arkansas
Opinion delivered October 21, 1996

*The Perroni Law Firm, P.A.*, by: *Samuel A. Perroni* and *Rita S. Looney*, for appellant.

*Davis, Cox & Wright*, by: *Walter B. Cox* and *Tim E. Howell*, for appellee.

ROBERT H. DUDLEY, Justice. This is another in the recent series of legal malpractice suits. In this one, Steve Adams, the attorney, agreed to represent Tyson Foods, Inc., in two separate underlying actions: one was to quiet title to a tract of land in Pope County, and the other was to defend a foreclosure action involving the same land. Both cases were removed to Federal District Courts for the Eastern District of Arkansas, the quiet-title action to the court of District Judge Henry Woods and the foreclosure action to the court of District Judge Susan Wright. Adams was negligent in his representation of Tyson in both cases. In the quiet-title action, he failed to respond to motions for summary judgment and failed to notify Tyson that judgment had been entered against it; in the foreclosure suit, he failed to respond to motions and failed to notify his client that the property was about to be sold. Tyson subsequently filed this malpractice action against Adams in the Circuit Court of Washington County. The Honorable David Burnett, circuit judge on exchange, ruled on summary judgment that Adams was negligent, but that such negligence was not the proximate cause of damage to Tyson. We affirm the ruling.

In 1982, Valmac Industries, Inc., a poultry producer, needed a larger freezer facility to store its poultry products in Russellville. Valmac was short of capital because of its rapid growth. In addition,

interest rates were high, approximately 15%, and so Valmac decided to finance the expansion by using a sale and leaseback with an option to purchase. This way, Valmac could use someone else's capital to build the facility. Valmac reached agreement with Satterfield Development, Inc., a Russellville builder, for the sale and leaseback with an option to purchase. In performance of that agreement, Valmac deeded the land on which the freezer was located to Satterfield Development. The consideration recited in the deed was $166,000, Valmac's book value, which was considerably less than the facility's market value. Satterfield Development then leased the property back to Valmac and gave it an option to purchase. The consideration recited in the lease was $49,000 per month through March 1, 1988, and, at that time, Valmac had the option of purchasing the facility at its fair market value. Valmac employed an outside attorney to give an opinion on the validity of the lease and option. Upon review of the deed, lease, and purchase agreement, the attorney gave his opinion that the lease and option was a valid lease and was not voidable under the then-existing usury laws. Valmac's Board of Directors authorized the transaction by resolutions dated August 19 and 23, 1982.

On August 30, four days after the lease and option were executed, Valmac and Satterfield Development, through Blake Lovett, president of Valmac, and George Satterfield, president of Satterfield Development, signed a separate letter agreement. Lovett testified by deposition that the letter agreement was signed as the result of a side agreement he and George Satterfield had previously entered. In the side agreement the option price was fixed at $68,660, but was to be adjusted according to whether the federal discount rate, plus 5%, averaged more or less than 17% during the final thirty-six months of the term of the lease. Lovett explained that the agreement meant that the real option price was the difference between the amount paid in monthly rentals and the cost of construction plus the cost of interest, and that the option price was never intended to be an amount equal to the fair market value of the facility, as stated in the lease. Lovett testified that the side agreement was not disclosed so that Valmac could deduct the lease payments according to the terms of the original lease, rather than capitalizing them as required by tax laws and generally accepted accounting principles, and so that Valmac could avoid violation of the then-existing usury laws. Valmac also wanted to avoid disclosing the side option price because it was in violation of covenants with

its bank regarding asset and liability ratios. The side agreement was not disclosed to Valmac's independent counsel, its auditors, or its bank. Lovett testified that he "understood that if the agreement was disclosed that there would be consequences that might arise from the agreement."

Satterfield Development completed construction of the expansion, and beginning in March 1983, Valmac paid monthly rent to Satterfield Development. Valmac treated the lease as such and deducted the lease payments as made rather than capitalizing them. In October 1984, Tyson acquired approximately 80% of Valmac's common stock and at about the same time, as the successor-in-interest, began operating the freezer facility and making the rental payments to Satterfield Development. A formal merger of Valmac and Tyson took place on July 1, 1987. During meetings leading up to the acquisition of Valmac by Tyson, Lovett disclosed to Leland Tollett, president of Tyson, that the agreement with Satterfield was a "finance-type lease." Tollett, by deposition, testified that Lovett told him there was an agreement by which Valmac would obtain title to the property, and the formula for calculation of price was "based on an interest rate calculation."

In 1985, George Satterfield decided to build a large sawmill that was to be owned and operated by another of his corporations, Satterfield Lumber Company. Satterfield needed to borrow a considerable amount of money to construct such a large mill. On December 10, 1985, Savers Federal Savings and Loan Association extended a $1,600,000 loan to Satterfield and Satterfield Lumber Company. As part of the security for the loan, Satterfield, as president of Satterfield Development, executed a mortgage on the freezer property to Savers. In obtaining the loan from Savers, Satterfield provided Savers a copy of the lease and option agreement with Valmac. He did not disclose the side agreement to Savers. Satterfield constructed the sawmill and put it into operation, but soon began to lose money and fell behind in his payments to Savers. Savers notified Satterfield that it was considering its options, including foreclosing on the freezer property. The freezer property had a true market value of more than $2,000,000, as it was appraised in 1982 as having a fair market value of $2,900,000 and in 1990 as having a fair market value of $2,700,000 without the lease and $2,060,000 with the lease.

In 1988, Tyson attempted to exercise its option to purchase the

freezer according to the terms of the August 30, 1982, side agreement, the one providing that the purchase price was $68,660, with adjustments for construction costs and interest. Ironically, under this agreement, Satterfield Development owed Tyson upon Tyson's exercise of the option to purchase. Under the terms of the side agreement, Satterfield owed Tyson $169,298, less the agreed option price of $68,660, or a net of $100,638. Satterfield Development owed this amount because interest rates had fallen dramatically during the term of the lease. Satterfield eventually disclosed to Tyson that Satterfield Development could not convey clear title because the property had been mortgaged to Savers. Satterfield Development, Satterfield Lumber, and Tyson entered into various agreements in attempts to clear title, but all failed. Tyson and Satterfield Development executed a lease extension on June 1, 1988. Shortly thereafter, the original lease and option agreement, along with the lease extension, were recorded in the records of Pope County. During the late 1980's, Savers encountered its own capital problems and was taken over by the Resolution Trust Corporation under federal law.

Tyson employed Adams to file suit for specific performance of the side agreement and to quiet title. On May 19, 1989, Adams, on behalf of Tyson, filed the suit in the Chancery Court of Pope County against Satterfield Development, Satterfield Lumber, and Savers. The R.T.C. subsequently replaced Savers and caused the action to be removed to United States District Court. After removal, the R.T.C. filed a motion for summary judgment. Adams failed to respond on behalf of Tyson, and District Judge Henry Woods granted the motion dismissing the R.T.C., but not the other defendants. The primary basis of Judge Wood's ruling was that Tyson and its predecessor in interest could not rely on the secret side agreement under the *D'Oench, Duhme* doctrine. Adams failed to notify Tyson that the R.T.C. had been granted a summary judgment.

The R.T.C. initiated the foreclosure action against Satterfield Development and others on July 22, 1991. Tyson was made a party because of its claim to the property. Adams failed to respond for Tyson. The Honorable Susan Wright, United States District Judge, ruled that the R.T.C.'s interest was prior to all other interests in the property, including Tyson's, and entered a decree of foreclosure in favor of the R.T.C. Judge Wright relied on the ruling by Judge

Woods in making her decision.

Tyson employed new counsel, David Duke, who filed motions for reconsideration in both cases. Both federal district judges denied the motions, with Judge Wright stating that, in addition to other reasons for her original ruling, Savers, and, in turn, the R.T.C., was a bona fide purchaser for value and was without notice of Tyson's claim to the property. Judge Wright also indicated that Savers and the R.T.C. had no duty to inquire about Tyson's possession since it was consistent with the lease and option agreement submitted to Savers at the time the loan was made. Judge Wright also stated that Adams's negligence did not affect the outcome of the case since it was determined by facts that took place before Adams was employed. Tyson appealed the judgment in the foreclosure action and ultimately settled it by paying the R.T.C. a sum of $600,000.

Tyson then filed this suit against Adams in the Circuit Court of Washington County. The circuit judge granted Adams's motion for summary judgment, finding that there were no genuine issues of material fact and that Adams's negligence was not a proximate cause of damage to Tyson because Tyson could not have prevailed on the underlying cases. Tyson appeals from the granting of summary judgment by the circuit court.

Indubitably, Adams was negligent in his representation of Tyson in both of the underlying suits. As a result, all Tyson had to prove in order to recover was that it was damaged and that Adams's negligence was a proximate cause of those damages. *Anthony v. Kaplan*, 324 Ark. 52, 918 S.W.2d 174 (1996). On summary judgment, the circuit court ruled that Tyson could not have prevailed on the underlying causes of action; therefore, it could not prove proximate cause. Tyson takes issue with both the procedure and the substance of the ruling by the trial court.

## I. Procedure

Tyson questions the determination of proximate by means of summary judgment. Summary judgment is to be granted by a trial court when it is clear that there is no genuine issue of material fact to be litigated, and, on appellate review, the appellate court determines if the granting of summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material question of fact unanswered. *Knowlton v. Ward*, 318 Ark. 867, 889 S.W.2d 721

(1994). While the question of proximate cause is usually a question for the jury, when the evidence is such that reasonable minds cannot differ, the issue becomes a question of law to be determined by the trial court. *Skinner* v. *R.J. Griffin & Co.*, 313 Ark. 430, 855 S.W.2d 913 (1993). The granting of summary judgment can be appropriate in a legal malpractice suit. *Anthony* v. *Kaplan, supra.* Here, there was no question of material fact to be determined, and the evidence was such that reasonable minds could not differ about proximate cause. Thus, the trial court correctly granted summary judgment.

## II. Substantive Law

Tyson contends that the circuit judge erred in granting the summary judgment because it could have prevailed in the underlying causes of action. In support of its argument it contends that: (1) United States District Judge Woods erred in ruling on the quiet title action and (2) United States District Judge Wright erred in ruling on the foreclosure action.

### (1)

Tyson argues that Judge Woods erroneously applied the *D'Oench, Duhme* doctrine and that the circuit judge, by granting summary judgment, failed to acknowledge the error. In his memorandum opinion and order, Judge Woods concluded that Tyson, the successor to Valmac, was estopped from relying on the side agreement to establish its right to the property against the R.T.C.

In 1942, the United States Supreme Court held that an agreement that was not expressly reflected on the face of a loan document was unenforceable against the Federal Deposit Insurance Corporation. The Court examined the statutory scheme that created the F.D.I.C. and concluded that it evidenced a "federal policy to protect...[the F.D.I.C.] and the public funds which it administers, against misrepresentations as to...the assets in the portfolios of the banks which...[the F.D.I.C.] insures or to which it makes loans." *D'Oench, Duhme & Co.* v. *F.D.I.C.*, 315 U.S. 447, 457 (1942). In order to give effect to this federal policy, the Court fashioned a common law rule of estoppel that precludes a borrower from asserting defenses against the F.D.I.C. based upon secret or unrecorded "side agreements" that alter the terms of facially unqualified obligations. The doctrine was expanded to protect the Federal Savings and Loan Insurance Corporation from undisclosed agreements in

*Mainland Savings Ass'n* v. *Riverfront Associate, Ltd.*, 872 F.2d 955, 956 (10th Cir. 1989), *cert. denied*, 493 U.S. 890 (1989). The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 abolished the F.S.L.I.C. and created the R.T.C. as receiver. Pub. L. No. 101-73, § 501, 103 Stat. 183, 363, 370 (1989). The *D'Oench, Duhme* doctrine has been extended to the R.T.C. *See Castleglen, Inc.* v. *Commonwealth Sav. Ass'n*, 728 F. Supp. 656 (D. Utah 1989). The doctrine has evolved expansively to protect the F.D.I.C. against affirmative claims by third parties based upon unrecorded agreements. *See Royal Bank of Canada* v. *F.D.I.C.*, 733 F. Supp. 1091, 1096-97 (N.D. Tex. 1990). "It is entirely consonant with the Fifth Circuit's interpretation of *D'Oench, Duhme* to apply the rule outside the lender-borrower framework, so long as the party seeking to recover must rely upon a scheme or arrangement likely to mislead bank examiners." *Id.* at 1097; *see also Bell & Murphy & Assocs., Inc.* v. *Interfirst Bank Gateway, N.A.*, 894 F.2d 750, 753-54 (5th Cir. 1990).

In 1989, Congress enacted many of the provisions of the common law doctrine. The codification, in material part, provides:

> *No agreement which tends to diminish or defeat the interest of the Corporation [R.T.C.] in any asset acquired by it under this section* or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, *shall be valid against the Corporation* unless such agreement—
>
> (A) is in writing,
>
> (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (C) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (D) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e) (1984) (emphasis supplied).
Under the facts of this case it does not matter whether we decide it under the common law doctrine or the statute enacted in 1989, a point not argued. *See O'Melveny & Myers* v. *F.D.I.C.*, 114 S. Ct. 2048 (1994) (holding that court-made rules are preempted by com-

prehensive, detailed statutory schemes); *Murphy* v. *F.D.I.C.*, 61 F.3d 34 (D.C. Cir. 1995) (interpreting *O'Melveny & Myers* as implicitly holding that FIRREA preempts the *D'Oench, Duhme* doctrine).

In the quiet-title action, Judge Woods found:

> The undisputed facts establish that Valmac, and later Tyson, lent themselves to a scheme or arrangement whereby banking authorities were likely to be misled. Without knowledge of the side agreement, Savers made a 1.6 million dollar loan to Satterfield Lumber Company and George Satterfield. As part of the security for this loan, Satterfield Development, which held title to the freezer, provided Savers with a mortgage on the property. It was not until Tyson expressed its intent to exercise its option to purchase the freezer for the sum set forth in the side agreement that Savers became aware of the agreement. Tyson cannot now enjoy the benefit of this agreement because to do so would cause the RTC to lose a significant portion of the security supporting the 1.6 million dollar loan. Thus, Tyson is estopped form litigating the validity of the agreement.

After Tyson filed its motion for reconsideration, Judge Woods again concluded that summary judgment was appropriate, as follows:

> The court has re-examined the order in light of the matters addressed in this motion. Despite the assertions contained in the motion, the court finds that the disposition of the R.T.C.'s motion for summary judgment was correct.

Tyson argues that Judge Woods erred, and, consequently, the trial court erred in granting summary judgment because a material question of fact existed about whether the side agreement was a secret agreement or whether it was a subsequent modification by letter of the original agreement. The argument is without merit for either of two reasons. First, Lovett testified that he and Satterfield openly entered into the sale and leaseback with option to purchase, and kept secret the side agreement, in order to avoid disclosing violations of the usury law and violations of capital requirements to Valmac's bank and so that Valmac could fully deduct the lease payments, rather than capitalizing them, for income tax purposes. Tollett acknowledged that Lovett disclosed that there was a "finance-type lease" and that the option price was set by a "formula based on an interest rate calculation." Thus, reasonable

minds could not differ; the side agreement was a secret side agreement and not merely a modification of the original agreement. Second, the side agreement was not disclosed to Savers. Under these circumstances, Valmac and its successor-in-interest, Tyson, were properly prevented by the doctrine from enjoying the benefits of the secret agreement that would have defeated a significant part of Savers's and the R.T.C.'s security, at the expense of the public.

■■ Tyson next contends that Judge Woods erred in applying the doctrine to it, since it was merely a third party. This argument is without merit for any of three reasons. First, the doctrine extends not only to knowing participants in schemes, but also to parties that are ignorant or ill-informed of the transaction and who did not intend to deceive anyone. *D'Oench, Duhme*, 315 U.S. at 458-59; *Bell & Murphy & Assocs., Inc., supra.* Second, Tyson knew the lease was a "finance-type lease" and that the option price was fixed on a "formula based on an interest rate calculation," rather than the fair market value. Third, Tyson is the successor-in-interest of Valmac and stood to gain by Valmac's misleading Savers.

Tyson argues that Judge Woods erred in applying the doctrine because Tyson was not notified by Savers that it held a mortgage on the leased property. The short answer to this argument is that Savers was led by the sale and leaseback and option agreement to believe that Valmac, and later Tyson, was a lessee of the property owned by Satterfield Development. Again, there was no dispute of material fact, and reasonable minds could not differ.

■ In summary, Judge Woods, and subsequently the circuit judge in this action, ruled correctly in applying the *D'Oench, Duhme* doctrine. The facts that caused the application of the doctrine occurred before Tyson employed Adams to file the quiet-title action. Thus, Adams's negligence in prosecuting the action were not the proximate cause of damage to Tyson.

(2)

Tyson contends that Judge Wright erred by ruling in favor of the R.T.C. in the underlying foreclosure action and that the circuit court similarly erred in granting summary judgment. Judge Wright ruled that the R.T.C.'s interest was superior to Tyson's interest on the ground that Judge Woods had "held that this interest could not be asserted to defeat the interest of the R.T.C." Tyson subsequently filed a Rule 60(b) motion for reconsideration. Judge Wright's com-

ments in ruling on that motion are abstracted in the supplemental abstract as follows:

> Therefore, I have reviewed parts of that file including Judge Woods's order, and I have looked, in other words, at the merits of the case, and I find that Judge Woods reached a correct conclusion in granting summary judgment and, therefore, I reached a correct conclusion granting summary judgment in the foreclosure decree.

> In my opinion, the failure of Mr. Adams to file a response to the respective motions for summary judgment did not result in anything worse for Tyson than happened anyway. I do not think it would matter. That is my opinion. I think the result, even if he had filed a responsive pleading to that motion for summary judgment in my case or in Judge Woods's, the result would have been the same. An let me tell you for the record that that's my opinion.

> ...

> I have no opinion concerning why the side agreement was entered into. I am not expressing whether I think that is a good idea or a bad idea. I do note, however, that in the pleadings in Judge Woods's Court, Tyson says that it all along considered itself to be the owner of tract 7. If it considered itself to be the owner of tract 7, by golly, it should have known to record its interests of record to protect itself from any bona fide purchasers, including Savers.

Any first year law student knows that if you claim an ownership interest in property, you need to record it to protect your interests against bona fide purchasers. Tyson, for its own reasons, recorded neither agreement, neither the lease of August 27 nor the agreement of August 30.

However, Satterfield, for reasons I think I know, showed Savers only the August 27 agreement which, of course, impaired no security interest at all because it provided for a purchase price at fair market value. It is no impairment of the security whatsoever. In fact, in some instances, it might be good to have something like that when you are reviewing loan papers in behalf of the creditor.

And therefore, I find that Judge Woods was correct that failure on the part of Mr. Steve Adams to respond to the respective mo-

tions for summary judgment did not prejudice Tyson. I do not know that Mr. Adams could have said in response to that motion that would change that.

■ In opposition to the above comments, Tyson argues that Judge Wright was additionally in error as a matter of law in applying the *bona fide* purchaser doctrine and the doctrine of unclean hands, as well as in her consideration of public policy. We do not reach those arguments because we affirm the ruling of the circuit court on the applicability of the *D'Oench, Duhme* doctrine to both the quiet title and foreclosure actions, and Adams's negligence in those actions did not proximately cause damage to Tyson.

Affirmed.

Special Chief Justice RALPH C. MURRAY, Special Justice FLOYD M. THOMAS, JR., and Special Justice LAURIE A. BRIDEWELL join in this opinion.

JESSON, C.J., and NEWBERN, CORBIN, and BROWN, JJ., not participating.