Franklin David CHAMBERS, M.D. *v.*
Harold Patrick STERN, M.D.;
George Hamilton, M.D.; and
University of Arkansas Board of Trustees

01-568 64 S.W.3d 737

Supreme Court of Arkansas
Opinion delivered January 17, 2002
[Petition for rehearing denied February 14, 2002.*]

---

* IMBER, J., not participating.

*David M. Hargis* and *Douglas W. Bonner, Jr.*, for appellant.

*Mitchell, Williams, Selig, Gates & Woodyard*, by: *Stuart P. Miller*, and *Barrett & Deacon, P.A.*, by: *D.P. Marshall Jr.* and *Leigh M. Chiles*, for appellee Harold Patrick Stern, M.D.

*Anderson, Murphy & Hopkins, L.L.P.*, by: *Michael P. Vanderford*, for appellee George Hamilton, M.D.

*Rhonda M. Thornton*, Associate General Counsel, for appellee University of Arkansas.

R OBERT L. BROWN, Justice. The appellant, Franklin David Chambers, M.D., appeals from an order of dismissal in favor of the appellee University of Arkansas Board of Trustees; an order granting summary judgment in favor of appellee George Hamilton, M.D.; and an order granting summary judgment in favor of appellee Harold Patrick Stern, M.D. We find no error in the circuit judge's various orders, and we affirm the dismissal and summary judgments.

The underlying facts in this case concern a divorce action between Chambers and his wife, Debra. The couple had five children: Sylvia, Keith, Jenny, Brandi, and Alexee, and custody and visitation issues regarding the children were hotly contested. As part of the divorce action, Dr. Stern had been appointed to assist the chancery court in evaluating custody and visitation matters.

On June 30, 1997, Chambers sued the University of Arkansas Board of Trustees for medical malpractice for employing Stern, who, Chambers contended, misrepresented his credentials and used an experimental patient model in treating the Chambers family. According to Chambers, he was entitled to a direct action lawsuit against the liability carrier for the University Board of Trustees, St. Paul Fire & Marine Insurance Co., pursuant to Ark. Code Ann. § 23-79-210 (Repl. 1999).

In that same complaint, Chambers also sued Hamilton (1) for engaging in a civil conspiracy with Stern which resulted in Chambers's estrangement from his children, and (2) for medical malpractice in breaching the applicable standard of care by diagnosing Chambers with a narcissistic personality disorder after one forty-five minute session. The complaint added a cause of action against Stern for (1) defrauding Chambers by misrepresenting his credentials and engaging in an experimental therapeutic model, and (2) medical malpractice by violating the applicable standard of care and turning Chambers's children against him.

On July 18, 1997, the University Board of Trustees moved to dismiss the complaint against it on grounds that it was an instrumentality of the State and not subject to suit under the doctrine of sovereign immunity. In addition, the Board maintained that it had no liability coverage for the acts alleged in Chambers's complaint. On December 18, 1997, the trial court dismissed the complaint against the Board with prejudice.

On July 23, 1998, Hamilton moved for summary judgment on the basis that there was no evidence to establish a civil conspiracy between Stern and him and no evidence that he deviated from the applicable standard of care. On January 11, 2000, the trial court agreed with Hamilton and granted his motion.

On May 26, 1998, Stern moved for dismissal of the complaint against him or, in the alternative, summary judgment on grounds that he was immune from suit due to the judicial appointment and because there was no doctor-patient relationship between Chambers and him. On June 4, 1998, the trial court agreed that Stern was immune and granted Stern's motion to dismiss. Later, on October 8, 1998, the trial court amended its order to a grant of summary judgment and included a Rule 54(b) certification for immediate appeal. It is this order that was first appealed to this court by Chambers. We reversed and remanded the case for the trial court to determine whether Stern was acting within the scope of the chancery court's order when treating the Chambers family so as to afford him the protection of judicial immunity. *See Chambers v. Stern*, 338 Ark. 332, 994 S.W.2d 463 (1999) (*Stern I*).

On remand, the trial court again granted Stern summary judgment on October 23, 2000. The court found that during the first relevant time period, June 23, 1993 — April 18, 1994, Chambers had failed to assert facts that demonstrated Stern exceeded the scope of the chancery court's order. The court further found that Chambers could not "overcome Stern's immunity by asserting that he was not a good therapist, or that he should have been a better therapist." Finally, the court found that there was no showing that Dr. Stern was not functioning as a therapist within his court-appointed capacity during that time period.

As to the second relevant time period, April 18, 1994 — the later of the last therapy session by any family member with Dr. Stern or Dr. Stern's final communication with the chancery court, the court ruled that:

Dr. Stern's involvement with Sylvia [sic], Alexee and Brandi related to his role as a court-appointed therapist dealing with the post-divorce issues of visitation, including but not limited to the issues of the parents' subsequent companions and remarriage.[1] Any therapy performed by Dr. Stern appears to be inextricably linked to the chancery court's mandate. Thus, Dr. Stern's actions were within the scope of the April 18, 1994, divorce decree and are entitled to judicial immunity.

## I. Board of Trustees

Chambers first argues that pursuant to Ark. Code Ann. § 23-79-210 (Repl. 1999), he should be able to pursue a direct action against any liability insurer of UAMS and its Board of Trustees. He asserts that even though Stern and Hamilton admit that they are personally insured by a specific insurer (St. Paul), the Board has denied that it has any liability coverage covering it for the acts and this is not correct. Chambers further claims in his only citation to authority that pursuant to the doctrine of *stare decisis*, the trial court's ruling should be reversed because of this court's decision in *Rogers v. Tudor Ins. Co.*, 325 Ark. 226, 925 S.W.2d 395 (1996).

The Board responds that it had no liability coverage and that only the University's faculty, physicians, surgeons, students and the like are insured under the St. Paul policy. The Board points to the affidavit of Lynda Fossing, an account underwriter for St. Paul Medical Services which states that only individuals are included on the lists under the Coverage Summary of the policy, and not UAMS or any organization. The Board further claims that Chambers has not offered any evidence to the contrary.

■ We first consider our standard of review. The trial court, in granting the Board's motion to dismiss, noted its reliance on several items, including supporting affidavits and exhibits. Although this court generally reviews a trial court's decision on a motion to dismiss by treating the facts alleged in the complaint as true and viewing them in the light most favorable to the plaintiff, where the court has acknowledged consideration of matters outside the parties' pleadings, including exhibits, depositions, and affidavits, the

---

[1] Two of the Chambers's five children, Sylvia and Keith, were attending college by this time and had attained their majority status. Though it is not entirely clear, the trial court may have meant to name Jenny rather than Sylvia in this portion of its order.

court will treat the trial court's order as one granting summary judgment. *See* Ark. R. Civ. P. 56(c); *Stern I, supra; Stapleton v. M.D. Limbaugh Constr. Co.,* 333 Ark. 381, 969 S.W.2d 648 (1998).

 This court uses the following standards for its review of orders of summary judgment:

> In these cases, we need only decide if the granting of summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion left a material question of fact unanswered. The burden of sustaining a motion for summary judgment is always the responsibility of the moving party. All proof submitted must be viewed in a light most favorable to the party resisting the motion, and any doubts and inferences must be resolved against the moving party. Our rule states, and we have acknowledged, that summary judgment is proper when a claiming party fails to show that there is a genuine issue as to a material fact and when the moving party is entitled to summary judgment as a matter of law.

> *Renfro v. Adkins,* 323 Ark. 288, 295, 914 S.W.2d 306, 309-10 (1996) (internal citations omitted); *Cash v. Lim,* 322 Ark. 359, 360-62, 908 S.W.2d 655, 656-57 (1995); *Oglesby v. Baptist Medical Sys.,* 319 Ark. 280, 284, 891 S.W.2d 48, 50 (1995). Once a moving party establishes a *prima facie* entitlement to summary judgment by affidavits or other supporting documents or depositions, the opposing party must demonstrate a genuine issue of material fact by meeting proof with proof. *Renfro v. Adkins, supra.*

*Crockett v. Essex,* 341 Ark. 558, 563, 19 S.W.3d 585, 588-89 (2000) (quoting *Milam v. Bank of Cabot,* 327 Ark. 256, 261-62, 937 S.W.2d 201, 653, 656 (1997).

 Chambers does little more in his argument than cite this court to the Direct Action statute, § 23-79-210, and *Rogers v. Tudor Ins. Co., supra.* We agree with Chambers that § 23-79-210 provides for direct actions against insurers to the extent of the insurance coverage carried on the organization or its employees. The initial factor, however, is whether there is coverage for the affected organization. Here, the Board maintains that neither it nor the University was covered by the St. Paul policy, and it presented the policy as well as the affidavit of Lynda Fossing, the account underwriter for St. Paul, as proof of its position. Chambers countered with no proof of his own. This failure of proof is fatal to Chambers's argument.

The trial court correctly determined that the Board is protected against being made a party in state court under the doctrine of sovereign immunity. *See* Ark. Const. art. 5, § 20.

■ Despite this absence of proof, Chambers claims that the case of *Rogers v. Tudor Ins. Co., supra,* stands for the proposition that because University physicians are covered by the St. Paul policy, this means that the University and its Board are also covered. We disagree. In *Rogers,* contrary to the present case, the board of trustees and the officers of the non-profit corporation were insured, and we held that those circumstances equated to coverage of the non-profit corporation itself. In the case before us, neither the Board nor the University's officers are covered — only its faculty and employees. These facts are a far cry from what was presented to us under the *Rogers* facts.

We affirm the trial court's order under this first point.

## II. Dr. Hamilton

For his next point, Chambers urges that the following facts were proved and that they raise material issues that could only be resolved by a jury:

- that Hamilton was aware of Stern's Therapeutic Model and his uses thereof;

- that Hamilton "acknowledged multiple opportunities to have reviewed the Stern Therapeutic Model in prior years, admitting that 'Dr. Stern has referred several patients to me over the years[;]' "

- that Hamilton admitted to discussing Chambers's circumstances with Stern prior to his diagnosis of Chambers, as documented by his notes, "Dr. Stern seems to be act[ing] entirely [for] the benefit of the children[;]"

- that Stern had prior knowledge that Chambers would see Hamilton on July 21, 1994;

- that Dr. Warren Seiler's affidavit demonstrates the wrong done by Hamilton and the deviation from the applicable standards of care;

- that Seiler stated in his affidavit that "Dr. Stern secured a mis-diagnosis in order to further complete the destruction of David Chambers' relationships with his children[;]"

- that Dr. Chester Jenkins stated in his affidavit that his evaluation of Chambers revealed no evidence of narcissistic personality disorder and that there were no findings of Hamilton which would support such a diagnosis or diagnostic impression;

- that in Dr. Carlene Lyle's deposition, she stated that Hamilton's diagnosis of Chambers based upon one interview was "precipitous;"

- that in a subsequent affidavit, Dr. Lyle stated that she knew that Hamilton was familiar with the Stern Therapeutic Model prior to Chambers's visit with Hamilton;

- that Dr. David Hall stated that "[a] reasonable psychiatrist would anticipate that the use of a diagnosis of narcissistic personality disorder would have a significant impact on the course of ongoing therapy[;]"

- that Stern used Hamilton's diagnosis to force "no contact" by Chambers with his children;

- that Hamilton worked together with Stern and Chambers's wife's attorney to secure an alternate therapist that would not be intimidated by Chambers; and

- that the Stern Therapeutic Model, known by Hamilton to be used, was truly bizarre and proximately caused the injuries claimed.

Chambers further argues that Hamilton's motion for summary judgment was supported by self-serving affidavits from Hamilton and Stern, both of whom were interested parties, and that summary judgment was inappropriate.

Hamilton's response is that no evidence of a conspiracy between Stern and him has been presented; nor is there any evidence that he committed any unlawful or deceitful act. Hamilton points to the fact that Chambers has conceded that he had no evidence or factual basis for his allegations of conspiracy. Additionally, Hamilton argues that there is no evidence that he was aware of

the therapeutic model and protocol used by Stern in his treatment of the Chambers family, and that even if there were such evidence, this would still fall short of proving a conspiracy between Stern and him to harm Chambers. As to the affidavit of Dr. Seiler, Hamilton emphasizes that Seiler has no personal knowledge of a conspiracy; he had no personal involvement in the underlying divorce or treatment of the family or Chambers; and that all of his conclusions are based on the faulty premise that Hamilton made a *final diagnosis* of the appellant. Moreover, Hamilton contends that he did not, as a matter of law, cause the injuries alleged by Chambers in that there is no evidence that he deviated from the applicable standard of care or that Chambers's alleged injuries were caused by any acts or omissions of Hamilton.

Chambers replies that he has documented the conspiracy and concludes that "[t]he evidence is available to show that the unorthodox, and catastrophic, practices followed by . . . Stern were generally known to those practicing in the field of psychiatry in central Arkansas, were known specifically by . . . Hamilton [and that m]uch damage was done, and the evidence of that is also available."

 This court has recently set forth the elements of civil conspiracy:

> [I]n order to prove a civil conspiracy, [one] must show a combination of two or more persons to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, by unlawful, oppressive or immoral means, to the injury of another. *Mason v. Funderburk*, 247 Ark. 521, 446 S.W.2d 543 (1969). Such a conspiracy is not actionable in and of itself, but recovery may be had for damages caused by acts committed pursuant to the conspiracy. *Id*. Civil conspiracy is an intentional tort requiring a specific intent to accomplish the contemplated wrong. 16 AM. JUR. 2d *Conspiracy* § 51 (1998).

*Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 445, 47 S.W.3d 866, 876 (2001). We have further said:

> A conspiracy may be shown by direct evidence of an actual agreement or understanding between conspirators, but it may also be shown by circumstantial evidence. *Chapline v. State*, 77 Ark. 444, 95 S.W. 477. It also may be inferred from actions of alleged conspirators, if it be shown that they pursued the same unlawful object, each doing a part, so that their acts, although apparently independent, are in fact connected and cooperative, indicating a closeness

of personal association and a concurrence of sentiment. *Wilson v. Davis*, 138 Ark. 111, 211 S.W. 152; *Stewart v. Hedrick*, 205 Ark. 1063, 172 S.W.2d 416; *Chapline v. State, supra.* Any act done or declaration made by one of the conspirators in furtherance, aid or perpetration of the alleged conspiracy may be shown as evidence against his fellow conspirators. *Wilson v. Davis, supra*; *Chapline v. State, supra.*

*Mason v. Funderburk*, 247 Ark. 521, 529, 446 S.W.2d 543, 548 (1969).

Hamilton is correct that Chambers has presented conclusions but has failed to show any direct or indirect evidence of a conspiracy. What did occur, based on the proof, is the following:

- Dr. Stern referred Chambers to Hamilton in July 1994;

- Hamilton met with Chambers on July 21, 1994;

- Hamilton made a progress note in his file which stated that his "diagnostic impression" of Chambers was "narcissistic personality disorder";

- Hamilton stated that the "diagnostic impression was based not only upon factual information verbally conveyed by Dr. Chambers, but also upon [Hamilton's] observations as to Dr. Chambers' demeanor, attitude, and other nonverbal means of communication"[;]

- Hamilton stated that the "diagnostic impression was not intended by [him] as a diagnosis and certainly not as a final or formal diagnosis"[;]

- Hamilton stated that he did not intend the progress note to be used in any legal proceeding;

- Hamilton did not recall any contact with Stern regarding Chambers before, on, or after, July 21, 1994;

- Hamilton had no record of the progress note ever being made available to Stern by him or his office;

- that Richard Byrd, Chambers's divorce attorney, by means of a medical authorization, obtained the records relating to

Chambers from Hamilton and that after receiving it, Chambers disclosed the progress note to the chancery court.

■ It would be pure conjecture to infer a civil conspiracy based on Sterns's referral of Chambers to Hamilton. Moreover, there is nothing in the way of proof to support the fact that Hamilton had any contact with Stern regarding his diagnostic impression of Chambers after his one forty-five minute session with the man. In short, there is a failure on Chambers's part to show any acts committed by Hamilton and Stern, in combination, to accomplish an unlawful, oppressive, or immoral purpose. *See Dodson v. Allstate Ins. Co., supra.* We affirm the trial court's summary-judgment order on this point.

■ ■ We next consider Chambers's claim that Hamilton was negligent in making the diagnosis of a narcissistic personalty disorder. In *Dodson v. Charter Behav. Health Sys., Inc.,* 335 Ark. 96, 983 S.W.2d 98 (1998), this court set out the requirements for a showing of negligence in the medical context:

> To establish a *prima facie* case of negligence, a plaintiff must show that damages were sustained, that the defendant breached the standard of care, and that the defendant's actions were the proximate cause of the damages. *See Union Pac. R.R. Co. v. Sharp,* 330 Ark. 174, 952 S.W.2d 658 (1997). Proximate cause is "that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." *Union Pac. R.R. Co. v. Sharp, supra; Craig v. Traylor,* 323 Ark. 363, 915 S.W.2d 257 (1996). Thus, a plaintiff must show causation in fact and legal causation. When there is evidence to establish a causal connection between the negligence of the defendant and the damage, it is proper for the case to go to the jury. *See McGraw v. Weeks,* 326 Ark. 285, 930 S.W.2d 365 (1996). But proximate causation becomes a question of law if reasonable minds could not differ as to the result. *See Union Pac. R.R. Co. v. Sharp, supra; Tyson Foods Inc. v. Adams,* 326 Ark. 300, 930 S.W.2d 374 (1996).

*Dodson,* 335 Ark. at 105, 983 S.W.2d at 103.

■ We conclude, again, that Chambers's assertions that a material fact question exists concerning negligence and his diagnosis by Hamilton is without merit. All of the affidavits and sworn testimony filed in support of Chambers's response to the summary-judgment motion presuppose that Hamilton's diagnosis was a final

diagnosis. This was clearly not the case. By its terms as entered in the progress notes, Hamilton formed a diagnostic *impression* following one forty-five minute session with Chambers. An impression is not a final diagnosis. Furthermore, there is no proof that Hamilton conveyed this diagnostic impression to Stern or to anyone else. We affirm the trial court on this point as well.

### III. Dr. Stern

For his third point, Chambers contends that in considering the trial court's grant of summary judgment in favor of Stern, we should conduct a *de novo* review. In making this contention, Chambers invites this court to revisit the issue of whether Stern was actually appointed by the chancery court for custody and visitation purposes and that, in any event, Stern practiced fraud on the chancery court and the Chambers family by misrepresenting his credentials and by employing an experimental therapeutic model.

Stern counters this by noting that the mandate in *Stern I* was for the trial court, on remand, to determine whether Stern's treatment of the Chambers family exceeded the scope of the chancery court's orders. Stern adds that Chambers failed to present any evidence that Stern's therapy exceeded the scope of those orders. We agree with Stern's assessment.

This court, in *Stern I*, specifically set forth the determinations it wanted the trial court to make:

> Accordingly, on remand, the trial court must determine as a matter of law [FN1] whether Dr. Stern's actions were within the scope of his court-appointed capacity, and if so, his actions taken pursuant to the appointment are entitled to judicial immunity.
>
> > FN1. Whether absolute immunity exists is a question of law for the courts. *See generally* 46 AM. JUR. 2d § 68 (1994 & Supp. 1999).
>
> However, if the trial court determines that Dr. Stern's actions were outside the scope of the court's appointment, it must determine at what point Dr. Stern exceeded the order and, consequently, forfeited his immunity. Specifically, the trial court must review Dr. Stern's involvement with the Chamberses from June 22, 1993, to April 18, 1994, in light of the chancery court's June 22, 1993, temporary relief order directing the following:

That while the Court does not find a physical and mental evaluation of the parties or the children appropriate, the Court does find that a qualified therapist or counselor agreed to by the parties should *meet with and counsel the parties and the children relative to the divorce proceedings in which they are involved and the visitation and other matters related thereto and to conduct all necessary evaluations on the parties and children in connection therewith;* that only one therapist or counselor should be used for all the children and the parties and that therapist or counselor should *report directly to the Court his or her findings and observations* and the Court will handle the release of such report to the attorneys for the respective parties; that if the parties are unable to agree on the therapist or counselor to be used, the Court will appoint a therapist or counselor after giving each of the parties an opportunity to supply the Court with the names and qualifications of any therapists or counselors suggested by them for use herein; that Defendant shall be responsible for the payment, as and when due, of all charges made by the therapist or counselor; and that both the parties shall cooperate with and be responsive to the requests and directions of the therapist or counselor involved. (Emphasis added.)

Next, the trial court must review Dr. Stern's interactions with the Chamberses from April 18, 1994, through the later of (1) the last therapy session by any family member with Dr. Stern, or (2) Dr. Stern's final communication with the chancery court, in light of the chancery court's April 18, 1994, divorce decree, directing the following:

The parties and the children are directed to cooperate with the Court appointed therapist, H. Patrick Stern, M.D., *to resolve visitation problems. Visitation is to be pursuant to Dr. Stern's direction pending further order of the Court.* [FN2] The Defendant is hereby directed to pay all charges associated with the subject therapy related to visitations problems pending further order of the Court. (Emphasis added.)

FN2. We render no opinion regarding (1) the validity of the trial court's instruction that, "Visitation is to be pursuant to Dr. Stern's direction pending further order of the Court," or (2) the effect of the validity of that instruction upon the application of judicial immunity to Dr. Stern. The instruction's validity was not challenged, and these issues are not before us on appeal.

Only after the trial court resolves the aforementioned legal issues may the jury consider the merits of appellant's malpractice claim.

*Stern I*, 338 Ark. at 338-40, 994 S.W.2d at 466-67.

██ On remand, the trial court made its decision. It determined that Stern's actions were within the scope of his court-appointed capacity and that he was entitled to judicial immunity. Again, Chambers has offered no proof to the contrary, and we will not consider, under our doctrine of law of the case, issues that could have been raised in the first appeal, such as the validity of the judicial appointment and fraud, but were not. *See McDonald's Corp. v. Hawkins*, 319 Ark. 1, 888 S.W.2d 649 (1994); *Alexander v. Chapman*, 299 Ark. 126, 771 S.W.2d 744 (1989).

Affirmed.

IMBER, J., not participating.