Cite as 2020 Ark. App. 62

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV–19–376

|  |  |
|---|---|
| LAMB & ASSOCIATES PACKAGING, INC. | **Opinion Delivered:** January 29, 2020 |
| APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FIFTH DIVISION [NO. 60CV-18-2961] |
| V. | |
| TROY W. BEST; JAMES A. BEST; AND PRECISION DIGITAL PRINTING, LLC | HONORABLE WENDELL GRIFFEN, JUDGE |
| APPELLEES | AFFIRMED |

## KENNETH S. HIXSON, Judge

The appellant, Lamb & Associates Packaging, Inc. (Lamb), is a corrugated box converter in Maumelle. A corrugated box converter receives sheets of unfinished corrugated box material from its suppliers and "converts" the material into specially designed corrugated boxes for its customers. In 2017, the company hired appellee Troy Best as an office manager. As a condition of his employment, Troy signed a "Non-Disclosure, Non-Solicitation, and Non-Competition Agreement" (Agreement) in which he agreed not to work for a competitor within two years of his separation from Lamb. Troy also agreed not to disclose any of Lamb's confidential information or solicit Lamb employees to work for any competing converter of corrugated boxes.[1]

---

[1]The Agreement defines "Company Business" as "the manufacture, purchase and/or sale of corrugated boxes and related packaging materials."

In 2018, Lamb terminated Troy's employment after discovering that Troy had shared some of Lamb's confidential information—including its plans to add a new high-speed digital printer to its conversion process—with his uncle, appellee James Best. James Best allegedly used the information to establish a new company, Precision Digital Printing, LLC (Precision), that would use the same digital printer to print detailed graphics onto corrugated board for other box converters that competed with Lamb.

Lamb filed a complaint in the Pulaski County Circuit Court seeking a series of injunctions against Troy Best, James Best, and Precision. Lamb alleged that Troy breached the Agreement, breached his fiduciary duty, and converted Lamb's confidential information. Lamb further alleged that James and Precision tortiously interfered with Troy's employment contract with Lamb, converted its confidential information, and aided and abetted Troy's breach of fiduciary duty. At the conclusion of a two-day trial, the circuit court ordered Troy to return all the confidential information that he had taken from Lamb after he was terminated but found no evidence of irreparable harm warranting injunctive relief. Lamb now appeals the circuit court's order. We affirm.

I. *Facts and Procedural History*

Lamb's customers are vendors that use corrugated boxes to make bulk shipments of their products to retailers. Lamb's process for converting the boxes begins with its purchase of sheets of unfinished corrugated board from a supplier. The process, otherwise known as "conversion," begins with the application of graphics, such as the product manufacturer's name and logo, onto the board. The board is then cut, slotted, glued, and folded into a box.

The part of the process that applies graphics to the corrugated board is the focus of this case. One method to apply graphics is to stamp the graphics directly onto the corrugated board using ink and printing dies that are mounted on a "flexograph" machine that also cuts and folds the corrugated board into a box.[2] Lamb has five flexograph machines that vary according to the amount of ink necessary to create the customer's desired image. Two of the flexograph machines have two colors of ink, two machines have three colors, and one flexograph machine has four colors.

Lamb uses a second method of applying graphics for customers who want more than four colors on their packaging. In those instances, Lamb glues a lithographic label to the board before it is cut and folded. Kyle Lamb, the president of the company, described the process as follows:

> [It] is a different process than the flexograph machine, to put labels on the box. We have another piece of converting equipment called an Automaton where we would buy a label with the graphics on it already [and] put it into the Automaton. The Automaton would put glue on the label and adhere it to the corrugated sheet. [A]t that point, we would take that corrugated sheet with the label on it back to the [flexograph], run it through the [flexograph] and finish it into a box. The Automaton is a kind of press that just applies the graphics.

Kyle also said that Lamb is one of only a few manufacturers in Arkansas that are capable of applying lithographic labels with an Automaton.

In 2015, Lamb began exploring a new digital printing method that would print lithograph-quality images directly onto the corrugated board. Operating like a large ink-jet printer, the new technology offered substantial benefits. Lamb could bypass the Automaton

---

[2]In this context, a "die" is a large tool that applies ink onto the corrugated board according to a customer's specifications.

and would no longer have to buy labels from a vendor. Digital printing was also superior to the printing process available on the flexographic machines, where any changes to a customer's desired image would require the purchase of an entirely new printing die at a cost of several thousand dollars. The new technology allowed Lamb to make the changes simply by editing an electronic file of the image.

Lamb hired a graphics design manager, Travis Beaty, to lead the search for a digital printer. Mr. Beaty performed cost studies of several digital printers, including those that were manufactured by EFI, a company that was well established in the digital printing business. Mr. Beaty initially determined that the first available digital machines, which printed images by making several passes over the corrugated board, were too slow to be of much use to Lamb.

In late 2017, however, EFI began selling a single-pass digital printer—the Nozomi 18000—that could apply a lithograph-quality image at a much higher rate than the multipass digital printers. It also applied the graphics at a higher rate—and lower cost—than the Automaton label machine that Lamb had been using. Lamb's interest in digital printing thereafter focused on the Nozomi 18000 (Nozomi), and Mr. Lamb and Mr. Beaty made plans to travel to North Carolina on May 1, 2018, to view a demonstration of the machine on a production line.

In August 2017, while Lamb's search for a printer was well underway, Lamb hired Troy for the newly created position of office manager. The position was created in response to the retirement of Jerry Lamb, the patriarch and founder of the company. Until then, the Lamb family "had always controlled all of the proprietary information" of the company.

Indeed, Kyle anticipated that Troy "was going to have access to a lot of our proprietary information," including Lamb's profit margins, customer lists, manufacturing processes, and costs. Consequently, when Mr. Lamb offered Troy the position of office manager, he "wanted some protection for Lamb because this was the first time that [Lamb] had allowed anybody outside the family access to what we considered proprietary information."

To that end, Troy's offer of employment was contingent on his execution of the Agreement. Section five addressed nondisclosure of confidential and proprietary information, providing that Troy

> shall not, directly or indirectly, disclose or use . . . any confidential information of which [he] is or becomes aware, whether or not such information is developed by [him], except to the extent that such disclosure or use is directly related to and required by [Troy's] performance in good faith of duties assigned to [him] by [Lamb].

The Agreement defined "confidential information" as information "that is not generally known to the public and that is used, developed, or obtained by [Lamb] in connection with its business." "Confidential information" included "trade secrets, know-how, products, offerings, business practices, methods, business plans, marketing plans, contracts with third parties and projections." It also included "details of [Lamb's] business relationships with customers, vendors, manufacturers, suppliers, and other persons with whom [Lamb] conducts business," and the "names and addresses of its current, past, or prospective customers, vendors, manufacturers and suppliers." Significantly, the Agreement also defined "confidential information" as "other non-public information, including but not limited to . . . pricing for materials and products, internal margin calculators, profit margins, costs, financial information, customer information and customer lists."

The restriction on disclosure applied during Troy's employment and two years thereafter if the confidential information did not qualify as a trade secret. Relatedly, in section four of the Agreement, Troy agreed to return all company property, including confidential information, following the termination of his employment.

The Agreement also prohibited Troy from attempting to lure other Lamb employees to work for one of Lamb's competitors. In section six, Troy agreed that he would not, directly or indirectly, either for himself or any other person or company, "induce or attempt to induce . . . any employee of [Lamb] to leave the service of [Lamb], or in any way interfere with the relationship between [Lamb] . . . and any employee[.]" Troy further agreed that he would not solicit any of Lamb's customers to move their business to Lamb's competitors.

The noncompetition clause was in section seven of the Agreement. There, Troy agreed that during his employment and for two years afterward, he would not "directly or indirectly be employed by, own, manage, control, participate in, consult with, render services for, or in any manner engage in or represent any business competing with [Lamb] in the company business in the geographic area." The agreement defined "company business" as "the manufacture, purchase, and/or sale of corrugated boxes and related packaging materials." The agreement also provided that "geographic area" meant "the State of Arkansas."

It was not long before Kyle began to suspect that Troy might be violating the terms of the Agreement. Kyle testified that in March 2018, his plant manager, Harvey Sisson, approached him with a concern about a conversation that he had with Troy. Mr. Sisson informed Kyle that Troy had called him to "talk to [Sisson] about . . . possibly participating

in a business venture with him." According to Mr. Sisson, Troy "made a statement about the digital [printer] and was interested in buying one of those and wanted to know if I wanted to help him get it started up." Troy also told Sisson that "his uncle had just sold his business and had a little money and might be interested in doing some investing in [that] particular project."

A couple of months later, in early May 2018, Kyle learned that Troy had a similar conversation with Mr. Beaty, the graphics design manager. Troy and Mr. Beaty had begun discussing Lamb's interest in the Nozomi printer in November or December 2017, and Troy eventually requested Mr. Beaty's case studies that compared the costs of Lamb's current processes with the costs of digital printing using the Nozomi. Later, Troy indicated that he "[had] an interest in the machine himself" and was considering "putting [one] . . . in Conway." The two men also talked about "maybe [Mr. Beaty] coming to work for him." Nonetheless, at that time, Mr. Beaty viewed the talk as harmless "office banter."

That all changed as Lamb's May 1 appointment in North Carolina to view the Nozomi drew near. A few days beforehand, Troy told Mr. Beaty that he was going to North Carolina "on his own" to see the Nozomi. According to Mr. Beaty, when Troy learned that Kyle and Mr. Beaty were scheduled to view the Nozomi at the same time and place, Troy appeared "pretty shocked" and abruptly left the room—apparently to make a telephone call.

Kyle and Mr. Beaty ultimately did not go view the Nozomi on May 1 as they had planned. The day before they were scheduled to leave for North Carolina, the salesperson from EFI called to inform Kyle that "they were having trouble with the machine at the

7

plant and that he was unsure whether it would be up and running the [day of their scheduled visit]." After speaking with Mr. Beaty a few days later, Kyle learned that Troy had taken a personal day from Lamb to secretly go to North Carolina to see a demonstration of the Nozomi with his uncle, James Best.

Kyle called a meeting on May 4, 2018, to confront Troy about what he had learned. Troy admitted that he had gone to see a demonstration of the Nozomi the day before Kyle had been scheduled to go. According to Kyle, Troy explained that he and James were "going to start a business that provides printing to converters like [Lamb] and [they] want[ed] Lamb to be one of [their] customers." The meeting ended with Troy's termination for alleged violations of the Agreement's noncompetition and nonsolicitation clauses.

A subsequent investigation suggested to Lamb that Troy also violated the Agreement's nondisclosure clause during his employment. There were emails demonstrating that Troy had shared some of Lamb's confidential information with his uncle James. In particular, Troy sent James cost studies that compared the costs of digital printing against Lamb's costs of applying labels for several of Lamb's customers. He also sent estimates of Precision's weekly production capacity that was based on some of Lamb's production information.

Kyle later learned that Troy also took several items of confidential information with him when he left Lamb. These included sales analyses demonstrating Lamb's sales through August 2017; a list of customers and items produced for each of those customers; a prospective customer list that Troy used in conjunction with Lamb's salesmen; a spreadsheet

8

that calculated Lamb's freight costs; and forms that Lamb used to calculate price quotes based on its profit margins, raw material costs, freight costs, and machine setup costs.

Consequently, on May 8, 2018, Lamb filed a complaint in Pulaski County Circuit Court against Troy alleging that Troy had breached the Agreement by disclosing and failing to return Lamb's confidential information; by soliciting Lamb's employees to his new business; and by forming a business that would compete with Lamb in the manufacture of corrugated boxes. The complaint further alleged that Troy breached his fiduciary duty to the company and converted Lamb's property, including "information concerning the [Nozomi], vendor information, pricing information, customer information, rate of return information and/or other proprietary and confidential information[.]" Lamb sought an order enjoining Troy "for the pendency of the action and for twenty-four (24) months following [the] judgment," from working for Precision, soliciting any Lamb employees, or using or further disclosing Lamb's confidential information.

Lamb later amended the complaint to include James Best and Precision as additional defendants. Lamb alleged that Troy conspired with James and Precision to unfairly compete with Lamb "by undertaking to provide printing services using [the Nozomi] to Lamb's competitors." Lamb also alleged that James and Precision tortiously interfered with the Agreement between Troy and Lamb, aided and abetted his alleged breach of fiduciary duty and, along with Troy, converted and misappropriated Lamb's confidential information. Consequently, Lamb sought an order enjoining all three defendants from using the Nozomi to "provide products or services to businesses engaged in the business of manufacturing, purchasing, and/or selling corrugated boxes and related packing materials in the State of

Arkansas." Lamb also asked the court to enjoin the defendants from "directly or indirectly, soliciting, on behalf of themselves or any other person or entity, including any customer of theirs, business that is of the same type as [Lamb's company business] from any of [Lamb's] customers," or soliciting any employee of Lamb. Lamb also wanted the defendants enjoined from any use or further disclosure of its confidential information, as well as the immediate return of the confidential information that was in their custody or control.

The circuit court heard the merits of the complaint during a two-day trial that was held on December 18–20, 2018. In addition to the evidence outlined above, Lamb offered Troy's and James's testimony as part of its case-in-chief.

Troy testified that he had a twenty-five-year career in the corrugated box industry, including owning two companies, prior to joining Lamb in 2017. He acknowledged, however, that he "learned of the Nozomi for the first time from Travis Beaty." He first discussed the printer with James at a family function, telling him that "it was interesting technology" and that he should "check it out." They subsequently agreed to explore creating Precision, a printing business whose customers "would be converters like [Lamb]." Indeed, according to Precision's business plan, other corrugated box converters would send their raw corrugated board to Precision, whereupon Precision would print graphics onto the board and return it to the converters for the rest of the conversion process.

Troy testified that he started formally planning the new business in January 2018. He explained that James relied on his experience in the corrugated box industry to determine whether Precision could be a viable business, and to that end, Troy prepared cost

10

studies that compared the costs of applying labels to the costs of digital printing and emailed them to James.

Troy further testified that he and James had email communications about Troy's obligations under the Agreement with Lamb. At James's request, Troy sent James a copy of the Agreement and shared his opinion that Troy's role in Precision would not violate the noncompetition clause. Troy explained that Precision would be "a printer, not a manufacturer of corrugated packaging," in part because Precision would "have no converting equipment." Troy also pointed out that Precision would "sell to converters [like Lamb] and other manufacturers [and] not their direct customers" and, in any event, would "print on various mediums" other than corrugated cardboard, including "corrugated foam [and] plastic."

Regarding his activities after his termination from Lamb, Troy testified that he continued to meet with EFI, the seller of the Nozomi. He and James obtained samples of the printer's capabilities, and Troy shared them with a friend at Arkansas Box, one of Lamb's competitors, "to get his opinion on what he thought the quality would look like." Troy denied working for Precision, but he acknowledged that he was earning a $150,000 salary as the first employee of one of James's other companies, Best and Best Leasing. He further testified that one of his duties was overseeing "the construction of the warehouse where Precision was going to install the Nozomi." Significantly, Troy added that while Precision would solicit Lamb's competitors for digital printing business, he had "no intention of calling on Lamb's customers."

James Best testified that while Troy gave him the idea for the new printing business, James "never asked Troy for anything to help [him] determine if [Precision] could be a viable business." James testified, in fact, that the "[cost] information was of absolute[ly] no value to [Precision]" because it was "a printing company" that was only "providing a service," and Precision was not going to buy any of the raw materials included in the cost studies that Troy had sent him.

James further declared that he and his wife "are the only owners of [Precision]," and at the time of his trial testimony, Precision had "zero employees." He explained that Precision had signed a contract to purchase the Nozomi printer, but delivery of the machine was not expected until January 2019—a month after the trial. James also explained that he did not "have any intentions whatsoever of being in the corrugated box business," and had not ordered "any machine . . . that would make a cardboard box." Rather, "Precision's primary customers [were] going to be box manufacturers."

At trial, Lamb rested its case after two days of testimony. Troy, James, and Precision all moved for "directed verdicts." The court granted dismissals to James and Precision on all the claims in the complaint, and it granted Troy's motion with regard to the alleged civil conspiracy. The circuit court denied Troy's motions, however, on Lamb's claims that he breached the Agreement, breached his fiduciary duty, and converted Lamb's confidential information.

Regarding the breach-of-contract claim, the circuit court ruled that Lamb proved that Troy breached the nondisclosure clause in the Agreement but failed to prove that "James Best solicited that information for Precision's benefit or that the breach of contract

12

acted in a way to result in unfair competition." The circuit court also found that there was no breach of tortious interference with the noncompetition clause because there was no proof that Precision was going to engage in "company business" as defined by the Agreement. Specifically, the court ruled that "company business" does not include printing, and there was no evidence that "the printer in question manufactures boxes."

The court further concluded that Troy's disclosure of confidential information was a breach of his fiduciary duty to Lamb. The court ruled there was no proof, however, that James and Precision aided and abetted that breach. Finally, the circuit court found that Troy "did convert confidential information to the benefit of James Best and Precision[.]"

In light of these findings, the circuit court ordered Troy to return or destroy all the confidential information that he still had in his possession. Finding no showing of irreparable harm, however, the circuit court denied all of Lamb's requests for injunctive relief. Lamb now appeals, arguing that Troy's alleged breaches of the Agreement's noncompetition and nondisclosure clauses warranted the injunctions it sought in its complaint. Lamb further contends that the circuit court erred by dismissing his claims against Troy and Precision for tortious interference, aiding and abetting Troy's breach of fiduciary duty, and conversion.[3]

---

[3]Both parties address the additional issue of whether there is an appealable order in this case and, albeit for different reasons, agree that we have jurisdiction. They are correct. Rule 2(a)(6) of the Arkansas Rules of Appellate Procedure–Civil provides that an appeal may be taken from "[a]n interlocutory order by which an injunction is granted, continued, modified, refused, or dissolved, or by which an application to dissolve or modify an injunction is refused."

## II. *Standards of Review*

The grounds for establishing the right to an injunction are straightforward. Lamb must show (1) that it is threatened with irreparable harm; (2) that this harm outweighs any injury that granting the injunction will inflict on other parties; (3) a likelihood of success on the merits; and (4) that the public interest favors the injunction. *City of Dover v. Russellville*, 363 Ark. 458, 460−61, 215 S.W.3d 623, 625 (2005).

Moreover, the decision to grant or deny an injunction is within the discretion of the circuit court, and we will not reverse a ruling granting or denying an injunction unless there has been an abuse of discretion. *Bettger v. Lonoke Cty.*, 2015 Ark. App. 366, at 3, 465 S.W.3d 438, 440. Further, we will not delve into the merits of the case further than is necessary to determine whether the lower court exceeded its discretion, and we review only whether "the circuit court departed from the rules and principles of equity in making its order, and not whether we would have made the order." *Id.* In reviewing the lower court's findings, moreover, we give due deference to the circuit court's superior position to determine the credibility of the witnesses and the weight to be accorded their testimony. *Id.*

## III. *Discussion*

### A. The Noncompetition Clause

Lamb first contends that the circuit court erred by refusing to grant an injunction based on Troy's alleged breach of the Agreement's noncompetition clause. According to Lamb, the circuit court erred by interpreting the Agreement as only prohibiting Troy from working directly as an employee of a corrugated box manufacturer that competes with

Lamb.[4] Lamb agrees that Precision itself is not one of its direct competitors, but it asserts that the noncompetition clause also prohibits Troy from directly or indirectly *providing services* to a corrugated box manufacturer competing with Lamb in Arkansas. Lamb further argues that the circuit court erred by finding that Lamb failed to establish a threat of irreparable harm in the form of "[a] reduction of margins, loss of customer items and orders, loss of customers, and reduced profits." Troy responds that we should reject these arguments because, among other things, the Agreement's noncompetition clause is unenforceable according to the standards set forth in Arkansas Code Annotated section 4-75-101. We agree.

"Covenants not to compete are not looked upon with favor by the law," *Duffner v. Alberty*, 19 Ark. App. 137, 139, 718 S.W.2d 111, 112 (1986), and "[c]ovenants not to compete in employment contracts are subject to stricter scrutiny than those connected with a sale of a business." *Id.* Arkansas Code Annotated section 4-75-101(a) (Supp. 2019) sets forth the standards for determining whether a covenant not to compete is enforceable. That law provides that

> a covenant not to compete is enforceable if the agreement is ancillary to an employment relationship or part of an otherwise enforceable employment agreement or contract to the extent that (1) the employer has a protectable business interest; and (2) the covenant not to compete agreement is limited with respect to time and scope in a manner that is not greater than necessary to defend the protectable business interest of the employer.

---

[4]The trial court and sometimes the parties interchangeably use the terms "manufacturer" and "converter" to describe the business of converting the unfinished sheets of corrugated material into the finished product. We do not intend to draw any distinctions between these terms.

The protectable business interest of the employer includes the employer's trade secrets, intellectual property, customer lists, goodwill with customers, knowledge of his or her business practices, methods, profit margins, and costs. *See* Ark. Code Ann. § 4–75–101(b)(1)–(8). It also includes

> other confidential business information that is confidential, proprietary, and increases in value from not being known by a competitor; training or education of the employer's employees; and other valuable employment data that the employer has provided to an employee that an employer would reasonably seek to protect from a competitor in the interest of fairness.

Ark. Code Ann. § 4-75-101(b)(9)–(11).

Moreover, according to the statute, the reasonableness of a covenant shall be determined

> after considering the nature of the employer's protectable business interest; the geographic scope of the employer's business and whether or not a geographic limitation is feasible under the circumstances; whether or not the restriction placed on the employee is limited to a specific group of customers or other individuals or entities associated with the employer's business; and the nature of the employer's business.

Ark. Code Ann. § 4-75-101(c)(2)(A)–(D). The test of reasonableness of contracts in restraint of trade is that the restraint imposed on one party must not be greater than is reasonably necessary for the protection of the other and not so great as to injure the public interest. *Duffner, supra.* More generally, "[i]f the restraint prohibits the promisor from engaging in activities that are unnecessary to protect the promisee, the covenant is unreasonable." *Freeman v. Brown Hiller, Inc.*, 102 Ark. App. 76, 81, 281 S.W.3d 749, 754 (2008).

We are not persuaded that Lamb had a protectable business interest in its confidential information, as it claims. The record indicates, rather, that the company did not take steps to prevent other employees with access to confidential information from using it to compete

16

with Lamb after their employment. Indeed, Mr. Sisson was responsible for overseeing Lamb's production lines, its shipping department, and the maintenance of its manufacturing plant. The customer service representatives and salespeople had access to customer and pricing information. Mr. Beaty used Lamb's confidential information to prepare cost studies and was the company's "point man for the development and research of digital printing." Unlike Troy, however, none of these employees signed a noncompetition, nonsolicitation, and nondisclosure agreement. There was no restriction, in other words, that prevented any of these employees—particularly Mr. Beaty—from resigning and using some of Lamb's confidential information to start a digital printing business like Precision, or to work for another corrugated-box converter like Lamb. Consequently, Lamb's confidential information was not a protectable business interest that warranted enforcing the non-competition agreement against Troy. *Cf. Rector-Phillips-Morse, Inc. v. Vroman*, 253 Ark. 750, 752, 489 S.W.2d 1, 3 (1973) (holding that noncompetition covenant could not be enforced when there was no restriction on several other employees with access to confidential information).

Moreover, we have held that a covenant not to compete may be enforced only if the associate is able to use the information to gain an unfair competitive advantage. *See Federated Mut. Ins. Co. v. Bennett*, 36 Ark. App. 99, 818 S.W.2d 596 (1991). Information that is readily ascertainable by anyone in the industry is not confidential, *See Borden, Inc. v. Smith*, 252 Ark. 295, 478 S.W.2d 744 (1972), and a noncompete agreement that merely prohibits ordinary competition is unenforceable. *Morgan v. W. Memphis Steel & Pipe, Inc.*, 22 F. Supp. 3d 929 (E.D. Ark. 2014). Here, the pricing information provided by Troy to James

17

conveyed only a few examples of costs, and some of the information pertained to conventional printing costs as opposed to the anticipated printing costs associated with the Nozomi printer. There was evidence that, because of the dynamics involved, a cost study would become irrelevant in as little time as a year. There was also evidence that information about the Nozomi printer and its capabilities is readily available to the public through sales representatives, trade shows, trade journals, and the internet. And while Precision has purchased a Nozomi printer, Lamb has not purchased a Nozomi printer and expressed no immediate plans to do so. Troy made it clear in his testimony that Precision will not be in the business of converting corrugated boxes, nor will it solicit Lamb's customers. This evidence demonstrated that the noncompetition clause as applied to these facts was too broad to be enforced and that any information obtained by Troy did not create an unfair competitive advantage. Accordingly, because we hold that the Agreement's noncompetition clause was unenforceable, we affirm the circuit court's order denying injunctive relief as to that clause.

## B. The Nondisclosure Clause

Lamb next argues that the circuit court erred by refusing to enjoin Troy from offering printing services to Lamb's competitors as a remedy for Troy's breach of the Agreement's non-disclosure clause. Lamb acknowledges that Troy has returned the confidential information that he had taken. Nonetheless, it asserts that the injunction is warranted because Troy, James, and Precision "can [still] use Lamb's confidential information to unfairly compete with Lamb by providing digital printing to Lamb's competitors at prices that enable them to solicit customer business presently enjoyed by Lamb." Lamb calls this

18

"the epitome of unfair competition," and therefore argues that the circuit court "should have . . . precluded Troy from providing digital printing services to Lamb's competitors" and "preclude[ed] him from using any of Lamb's confidential information." We disagree.

"Irreparable harm is the touchstone of injunctive relief[,]" and "harm is normally only considered irreparable when it cannot be adequately compensated by money damages or redressed in a court of law." *United Food & Commercial Workers Int'l Union v. Wal-Mart Stores, Inc.*, 353 Ark. 902, 906–07, 120 S.W.3d 89, 93 (2003). Stated another way, irreparable harm occurs "where an injury is a recurring one and the damages are substantial that equity will restrain by injunction." *Id.* at 907, 120 S.W.3d at 93.

Lamb did not demonstrate that it is threatened with unfair competition as a result of Troy's breach. Lamb did not show that Troy disclosed Lamb's costs, profit margins, customer lists, or other confidential information to any of Lamb's competitors or, in the absence of proof that a competitor has hired Troy or Precision, that such disclosure is inevitable. *Cf. Cardinal Freight Carriers, Inc. v. J.B. Hunt Transp. Servs.*, 336 Ark. 143, 152, 987 S.W.2d 642, 646 (1999) (observing that misappropriation of a trade secret may be established by showing that a former employee's new employment will inevitably lead him to rely on his former employer's trade secrets). Lamb also did not offer proof that Troy, James, or Precision has solicited any of Lamb's customers on behalf of a competitor.

Additionally, it is unlikely that Precision will confer an unfair competitive advantage on another corrugated box converter merely because it elects to use digital printing services. The evidence at trial demonstrated that Lamb had yet to acquire a Nozomi printer or, for that matter, digital printing technology of any kind. Lamb's own employee, Mr. Beaty, also

19

established that the advent of digital printing technology was hardly a secret in the corrugated box industry. Kyle testified, in fact, that there were already "a few" Nozomi printers in the United States at the time of the trial in December 2018. Therefore, because Lamb has not shown that Troy's disclosures to James threatens unfair competition from other corrugated box manufacturers, we affirm on this point.[5]

C. Injunctive Relief against James and Precision

Lamb finally argues that the circuit court erred when it refused to grant injunctive relief against James and Precision. Lamb asserts that, contrary to the circuit court's ruling, substantial evidence supported its civil conspiracy, tortious interference, and aiding and abetting claims. Therefore, according to Lamb, the circuit court should have enjoined James and Precision from using its confidential information, or offering printing services, to give other corrugated box manufacturers a competitive advantage. Because Lamb again failed to show a threat of irreparable harm warranting an injunction, we affirm.

"One who knowingly aids, encourages, or cooperates with a fiduciary in the breach of his duty becomes equally liable with such fiduciary." *Raines v. Toney*, 228 Ark. 1170, 1182, 313 S.W.2d 802, 810 (1958) (internal citations omitted). Civil conspiracy, moreover, is an intentional tort requiring a specific intent to accomplish the contemplated wrong. *Chambers v. Stern*, 347 Ark. 395, 404, 64 S.W.3d 737, 743 (2002). To prove a civil conspiracy, one "must show a combination of two or more persons to accomplish a purpose

---

[5]Because we hold that the noncompetition clause was not enforceable, and Lamb failed to establish the threat of unfair competition from any disclosure of Lamb's confidential information, we reject Lamb's request to extend the noncompetition period one year from the date of this opinion.

20

that is unlawful or oppressive or to accomplish some purpose, not itself unlawful, oppressive or immoral, by unlawful, oppressive, or immoral means, to the injury of another." *Id*. (quoting *Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 445, 47 S.W.3d 366, 376 (2001)). Finally, to prove tortious interference, Lamb must show (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *E.g.*, *Office Machines, Inc. v. Mitchell*, 95 Ark. App. 128, 129, 234 S.W.3d 906, 908 (2006).

We hold that the circuit court did not err by denying injunctive relief against James and Precision. As we discuss above, Lamb has not demonstrated that Troy's association with Precision, or his disclosure of confidential information to James, will give other corrugated box converters an unfair competitive advantage. Furthermore, the evidence showed that Precision is not, and will not be, in the business of converting corrugated boxes and that it will not solicit or compete for Lamb's customers. Precision's operations will instead be focused on printing on various mediums with the Nozomi printer using technology and information widely available to anyone in the printing industry and to the public at large. There was an absence of proof that James or Precision interfered with Lamb's business of converting corrugated boxes for Lamb's customers or that their conduct caused or will cause any irreparable damage to Lamb's business expectancy. Accordingly, there was no error in denying Lamb's prayer for an injunction, and we affirm.

Affirmed.

KLAPPENBACH and VAUGHT, JJ., agree.

*Lax, Vaughan, Fortson, Rowe & Threet, P.A.*, by: *Grant E. Fortson* and *Roger D. Rowe*, for appellant

*Cahoon & Smith*, by: *David Cahoon*, for separate appellees James A. Best and Precision Digital Printing, LLC.

*Davidson Law Firm*, by: *Stephen L. Gershner*, for separate appellee Troy W. Best.