Cite as 2024 Ark. App. 310

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-22-486

|  |  |
|---|---|
| | **Opinion Delivered** May 15, 2024 |
| HIGHLANDS ONCOLOGY GROUP, P.A. | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT |
| APPELLANT | [NO. 72CV-22-1207] |
| V. | HONORABLE DOUG MARTIN, JUDGE |
| HERSHEY GARNER, M.D. | |
| APPELLEE | AFFIRMED |

### BRANDON J. HARRISON, Chief Judge

Highlands Oncology Group, P.A. (Highlands) appeals the preliminary injunction entered in favor of Dr. Hershey Garner. Highlands argues that the circuit court erred by not following the rule of non-review and by granting Garner's motion for a preliminary injunction. We affirm.

I.

Garner is a radiation oncologist who practiced with Northwest Arkansas Radiation Therapy Institute (NARTI) for approximately twenty years until NARTI was purchased by Highlands in 2008. Along with being a shareholder in Highlands and a member of its Board of Directors, Garner entered into an employment agreement with Highlands in 2008; this agreement gave specific limited terms under which Garner's employment could be terminated.

In early 2021, the radiology oncology (rad onc) department had only two physicians,

Garner and Chris McClinton.  In addition to hiring a third physician in 2021, Garner and McClinton discussed bringing Garner's son, Wesley, into the rad onc practice after Wesley graduated from medical school in 2022.  The minutes from the February 2021 executive committee meeting contain the following language:

> Hershey asked if anyone had an issue with Wes joining the practice as his replacement in 2022, and that he and Chris were agreed on that addition. The committee had no objections. It was pointed out that a contract for Wes had not been finalized and so hadn't been reviewed, and the board would need to be involved in that hiring decision due to Wes Garner being Hershey's son.

Garner later denied ever saying that Wesley would be his replacement and stated, "I don't know how that got in there."

While the shareholder physicians in the rad onc department generally have authority over its hiring decisions, Highlands has a company nepotism policy that states, "It is Highlands Oncology policy that members of your immediate family will not be considered for employment unless approval is granted by the Board of Directors."  When the decision about Wesley's employment came before the Board, Garner was asked not to attend the board meeting, and he did not object.  On 1 March 2021, the Board voted to approve the hiring of Wesley Garner.  That evening, Highlands' CEO, Jeff Hunnicutt, sent a text to Garner stating that the Board "voted unanimously to override the nepotism policy and allow Wes to join Highlands."  On March 4, Garner reviewed the minutes from the March 1 board meeting, which included the following:

> There was discussion and agreement that two family members couldn't effectively or fairly work together in the same department in these positions. Hershey has indicated that Wes will be his replacement, and he will retire prior to Wes'[s] start date.

The group determined that this variance to the policy would be granted with the understanding that Hershey will end employment prior to Wes beginning employment. Administration will assist in determining a preferred timing strategy.

A motion was made and seconded that Wes Garner be offered a position as radiation oncologist at Highlands but that there be no overlap of employment between Hershey and Wes. This motion was unanimously approved.

Garner contended that he had never said he would retire before Wesley's start date and sought to correct the Board's misunderstanding about the timing of his retirement. He texted Hunnicutt and said, "[T]here's a problem" with the minutes. Hunnicutt responded that he understood Garner's confusion because part of his text from March 1 had not gone through. The message that Garner had not received on March 1 stated, "We will still need to work through your departure, as the board does want to avoid two family docs working together." Garner responded, "We need to revisit that[.] . . . [L]et's address this sooner rather than later."

Garner and Hunnicutt also spoke in person soon after, and Hunnicutt told him that "the board felt strongly that two family members couldn't work together in the department." Garner responded that was a "non-starter" and that he was not going anywhere. He suggested a board meeting be convened right away to discuss the concerns and craft a solution. However, it was decided that the matter would be addressed at the next regular board meeting. Meanwhile, Highlands executed a contract hiring Wesley, and Garner signed as a witness to the contract. Garner interpreted the execution of Wesley's employment contract as a sign that "we were going to move forward, work together, and build the department, address the issues, and take care of patients."

The next board meeting was not held until almost a year later on 21 February 2022. The minutes from that meeting state:

> Jeff Hunnicutt informed the group that Hershey had asked for the board to be convened. Hershey Garner told the board that he would like to discuss the decision that he would need to terminate employment when Wes started, in acknowledgement of the no nepotism clause. Hershey said he had recently been surprised to hear from Jeff that he would need to leave by July 1st, and he wanted to know why he couldn't work with his son. Thad Beck mentioned that Hershey had requested Wes'[s] contract be fast-tracked approximately a year ago, and at that time Hershey had said he would leave when Wes came. Hershey responded that he didn't recall saying he'd leave immediately, and he would prefer to wind down. . . . [Thad] suggested that Hershey could potentially move into an emeritus role similar to Dr. Hayward where he might be assigned special projects or fill in if requested when a rad onc was on vacation.

> . . . .

> Dan Bradford stated that the board needed some time to discuss this and suggested another meeting in a month or two.

On 26 May 2022, Garner filed a complaint against Highlands alleging breach of contract and seeking a preliminary injunction requiring Highlands to maintain his status as an employee and shareholder of the company during the pendency of the case. In the complaint, Garner reiterated that Highlands' policy allows the hiring of immediate family members if approved by the Board of Directors, and in this case the board had approved pursuing an employment contract with Wesley. He asserted that Highlands was not firing him as a result of any action he had taken and that, pursuant to his employment agreement, Highlands did not have authority to terminate him absent some wrongdoing on his part. He also expressed extreme concern for his patients, who would have their doctor–patient relationship with him terminated while undergoing cancer treatment.

Garner also filed a formal motion for a preliminary injunction and an emergency

4

hearing. He argued that Highlands was acting outside any legal authority to terminate him from his position with Highlands, that the termination will cause irreparable harm not only to him but, more importantly, to the doctor-patient relationship with those cancer patients who are relying on him for their care and treatment, and that he has a reasonable probability of success in the litigation.

The circuit court scheduled a hearing on 8 June 2022. But on June 1, Garner moved for a temporary restraining order (TRO) after Highlands decided that he should be "relieved of any patient responsibilities and prohibited from all Highlands Oncology properties with immediate effect" in a letter dated 31 May 2022. The court entered the requested TRO on June 1, finding that Garner had demonstrated good cause for entry of the TRO and that the risk of irreparable harm to Garner's patients was immediate in the absence of the TRO. The court further found,

> Issuance of this TRO without notice is justified due to the intentional conduct evidenced by Defendant. Rather than present its case to the Court in eight days, the Defendant chose to bar Dr. Garner from access to its facilities and his patients, which is the very conduct Plaintiff[']s motion sought to enjoin.

The court ordered that Garner be provided full access to Highlands' clinics and equipment in order to treat his patients, that Highlands immediately cease diverting patients from Dr. Garner's care, and that Highlands maintain the status quo with regard to Garner's status as an employee and shareholder in all respects and take no action to lessen or remove his access to patients or Highlands' facilities.

After the June 8 hearing, at which the circuit court heard testimony primarily from Garner and Hunnicutt, the court found that irreparable harm to Garner's doctor-patient

5

relationships would result absent the issuance of a preliminary injunction.  The court also found that Garner had demonstrated a likelihood of success on the merits of his breach-of-contract claim.  (Specific findings from the court's ruling will be discussed below.)  Thus, the court issued a preliminary injunction that provided Garner shall have full access to Highlands' clinics and equipment in order to see his patients and shall see any patient that requests to be treated by him or is referred to him.  Highlands timely filed this interlocutory appeal from the circuit court's order.

## II.

We review a preliminary injunction under an abuse-of-discretion standard.  *City of Jacksonville v. Smith*, 2018 Ark. 87, 540 S.W.3d 661.  This is a high threshold that does not simply require error in the circuit court's decision but requires that the court act improvidently, thoughtlessly, or without due consideration.  *Holladay v. Glass*, 2017 Ark. App. 595, 534 S.W.3d 173.  We will not delve into the merits of the case further than is necessary to determine whether the circuit court exceeded its discretion in granting the injunction.  *City of Jacksonville*, *supra*.  The sole question before us is whether the circuit court departed from the rules and principles of equity in making the order and not whether the appellate court would have made the order.  *Id.*

## A. Rule of Non-Review

Highlands first argues that its internal affairs regarding Garner's employment status are not subject to court review and injunctive intervention because courts traditionally apply a "rule of non-review" to a private medical center's board decisions concerning medical staff appointments.  The Arkansas Supreme Court has addressed this rule on several

6

occasions. In *Brandt v. St. Vincent Infirmary*, 287 Ark. 431, 701 S.W.2d 103 (1985), a case of first impression, the supreme court held that a private hospital has a right to set its own policies regarding medical treatment and reasoned that there is "no compelling reason to conclude that a private hospital which is following appropriate state regulations must also be subject to judicial scrutiny as to the reasonableness standard of public hospitals." *Id*. at 437, 701 S.W.2d at 106.

In *Baptist Health v. Murphy*, 365 Ark. 115, 226 S.W.3d 800 (2006) (*Baptist II*), Baptist appealed a preliminary injunction and argued, in part, that the rule of non-review applied to preclude courts from reviewing the hospital's economic-conflict-of-interest policy. The doctors asserted that "the rule of deference to a hospital's credentialing decisions, or the rule of non-review, is one which must be limited to those instances where that decision does not involve a violation of law, or is not used as a means for the commission of a tort." *Id*. at 129–30, 226 S.W.3d at 812. The supreme court described the doctors' point as "well taken" and stated, "We do not believe that a private hospital may insulate itself from suit when, as here, there is a finding that the hospital's conduct has violated state law." *Id*. at 130, 226 S.W.3d at 812. The supreme court has also recognized a limited review for alleged violations of medical-staff bylaws and has restricted the relief available to injunctive relief, not damages. *Williams v. Baptist Health*, 2020 Ark. 150, 598 S.W.3d 487.

Here, Highlands argues, Garner made no claim that its actions violated corporate bylaws or state law, so neither exception to the rule of non-review applies. Highlands asserts that its Board of Directors, comprised of seventeen physicians with more than 230 years of combined medical experience, agreed that Garner and his son could not "effectively or fairly

7

work together in the same department." Therefore, the Board agreed to offer Garner's son a position in the rad onc department based on their expressed understanding and belief that Garner had agreed to retire prior to the commencement of his son's employment. Highlands contends that the Board's decision in this matter "is precisely the sort of decision-making that falls squarely within sound public policy foundations of the rule of non-review" and that the circuit court's injunction effectively supplants the court's judgment for that of the medical professionals. Highlands concludes that the circuit court abused its discretion in failing to adhere to the rule of non-review and in granting injunctive relief.

Garner responds by arguing that the rule of non-review does not apply in this case.[1] He was not an at-will employee, and the parties had an employment contract that specified limited terms under which his employment could be terminated. In contrast, no employment contract or an alleged breach of that contract was at issue in the non-review cases cited above.

The rule of non-review is generally applied to a private hospital's credentialing or other policy decisions unless one of the exceptions applies. *See Baptist Health v. Murphy*, 2010 Ark. 358, 373 S.W.3d 269 (*Baptist III*) (hospital's hiring policy subject to review because it violated state law); *Baptist II*, *supra* (same); *Brandt*, *supra* (private hospital's policy on medical treatment not subject to review). Here, Garner has not challenged the validity

---

[1]Garner also argues that Highlands' argument based on the rule of non-review is not preserved for appellate review because it failed to obtain a ruling on the issue. We disagree. Highlands' point that the rule of non-review was presented as a threshold issue for the circuit court and that reaching the merits of Garner's motion means the court necessarily found that the rule of non-review did not apply. That makes practical and logical sense to us.

8

of any of Highlands' policies or bylaws as applied to him; instead, he has alleged that the board breached its employment contract with him by terminating his employment without just cause. We therefore hold that the rule of non-review does not apply in this case.

B. Injunctive Relief

When deciding whether to issue a preliminary injunction pursuant to Ark. R. Civ. P. 65, the circuit court must consider two issues: (1) whether irreparable harm will result in the absence of an injunction or restraining order, and (2) whether the moving party has demonstrated a likelihood of success on the merits. *City of Jacksonville*, *supra*. Irreparable harm is the touchstone of injunctive relief, and harm is normally considered irreparable only when it cannot be adequately compensated by money damages or redressed in a court of law. *Lamb & Assocs. Packaging, Inc. v. Best*, 2020 Ark. App. 62, 595 S.W.3d 378. Although we review a circuit court's decision to grant a preliminary injunction on an abuse-of-discretion standard, factual findings that lead to a circuit court's conclusion of irreparable harm and likelihood of success on the merits will not be set aside unless clearly erroneous. *Thurston v. Safe Surgery Ark.*, 2021 Ark. 55, 619 S.W.3d 1. A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Chekuri v. Nekkalapudi*, 2020 Ark. 74, 593 S.W.3d 467.

1. *Likelihood of success on the merits*

The circuit court made the following findings in support of its ruling that Garner had demonstrated a likelihood of success on the merits on his breach-of-contract claim:

> a. Plaintiff has an employment agreement with Defendant with specific provisions regarding Defendant's entitlement to terminate Plaintiff's employment.

9

b. At the Defendant's March 1, 2021 Board meeting, the Board vote requiring Dr. Garner to leave Defendant's employ on or before the date that Dr. Wesley Garner joined the practice was an effective termination of his employment.

c. Defendant's CEO testified that on March 1, 2021, Dr. Garner was not in violation of any of the terms of his employment agreement or in violation of any company policies.

Highlands does not dispute the first and third findings but contends that the second finding—the Board vote on 1 March 2021 was an effective termination of Garner's employment—is clearly erroneous. It asserts that the Board vote did not require Garner to retire at any certain time; instead, the vote merely allowed Hunnicutt to negotiate with Wesley regarding employment and was based on the Board's understanding that Garner had represented to the executive committee that he would retire prior to any start date of his son's potential employment. Highlands claims that Garner's agreeing to retire before his son started his employment was a "condition precedent" to Wesley joining the practice, and "[i]f Appellee had notified the board or any of its members that he had not agreed and would not agree to retire prior to the start of any potential employment of his son, no offer of employment would have been made to Appellee's son."

Highlands further notes that Garner was aware of the Board's understanding (or misunderstanding) by 4 March 2021, but he failed to call a board meeting to clarify the situation. Instead, Garner stood by while contract negotiations with his son progressed, and he even signed his son's employment contract despite knowing the Board's position. Highlands argues that in signing his son's employment contract, Garner "agreed and consented to the contingency that he would retire prior to the start of his son's employment per the anti-nepotism policy." Because Garner now refuses to comply with the policy in

10

violation of his own employment contract—which requires him to comply with the reasonable policies, standards, and regulations of the company—Highlands has the authority to terminate Garner's employment. And finally, Highlands disputes that Garner was terminated on 1 March 2021 because he continued to work at the company for over a year.

Garner responds that Highlands is attempting to rewrite the facts in claiming that the 1 March 2021 meeting minutes expressly stated any "condition precedent" that had to be satisfied before Wesley could join the practice. Below, Highlands relied on its argument that Garner acquiesced to his retirement date when he signed Wesley's employment contract on 9 March 2021. In addition, there is no express statement in the 1 March 2021 meeting minutes of any "conditions precedent."

Garner also disagrees with Highlands's claim that if he had notified the Board or any of its members that he had not agreed and would not agree to retire prior to the start of any potential employment of his son, no offer of employment would have been made to Wesley. Garner argues that he communicated precisely that sentiment to Hunnicutt three days after the March 1 board meeting, that he (Garner) suggested another board meeting to address the issue, and that ultimately, they decided it could be addressed at the next regularly scheduled board meeting. Meanwhile, Hunnicutt quickly proceeded with executing Wesley's employment contract, which was signed 9 March 2021, just eight days after the board meeting. Garner argues that by acting so swiftly, Highlands "literally create[ed] the conflict before convening the board to address what Appellee believed was simply confusion about his position on retirement."

Finally, Garner denies that signing Wesley's employment contract was an agreement

to retire effective 30 June 2022 and that the 1 March 2021 board decision was not an effective termination because he continued to work at Highlands. He concludes that the board's authority under the antinepotism policy is to authorize the hiring of a family member, and in this case, it chose to authorize Wesley's hiring. The Board, however, did not have the authority to force him into early retirement by entering into an employment contract with Wesley. Its decision breached Garner's employment contract, which specified the limited circumstances under which he could be terminated.

Highlands does not dispute that Garner's employment agreement had specific provisions regarding its entitlement to terminate Garner's employment and that, on 1 March 2021, Garner had not violated any terms of his employment. Nevertheless, the Board vote required Garner to stop working for Highlands prior to Wesley's start date, and Garner's termination date was later set for 30 June 2022. The Board's decision to hire Wesley was not, arguably, a basis on which Highlands could terminate Garner's employment contract. Because Garner provided sufficient proof to demonstrate a likelihood of success on the merits, we hold that the circuit court did not abuse its discretion in checking this "box," so to speak, in its analysis.

2. *Irreparable harm*

The circuit court found that irreparable harm to Garner's doctor-patient relationships would result absent the issuance of the preliminary injunction, and it set forth the following findings:

> a. Dr. Garner is a radiation oncologist, treating patients at their most vulnerable state and dealing with treatments involving life and death health issues.

b. Denial of the injunction would result in disruption to and elimination of his doctor-patient relationships with these cancer patients.

c. Defendant's arguments that Dr. Garner's patients would be adequately treated by other physicians is unavailing. As noted in *Baptist Health v Murphy*, "physicians are not fungible as to their relationships with patients or their specialties of practice." 365 Ark 115, 133, 226 S.W.3d 800, 813.

Highlands contends that Arkansas courts have consistently held that disputes over a loss of employment do not impart the sort of irreparable harm that is necessary to justify the invocation of injunctive relief. *See Doe v. Ark. Dep't of Hum. Servs.*, 357 Ark. 413, 182 S.W.3d 107 (2004) (certified nursing assistants not entitled to injunctive relief because any wrongful and illegal loss of employment can be fully compensated by money damages); *Manila Sch. Dist. No. 15 v. Wagner*, 356 Ark. 149, 148 S.W.3d 244 (2004) (preliminary injunction not warranted because former superintendent could be compensated with money damages for loss of her job and the corresponding loss of salary, possibility that she might have to relocate to obtain similar employment, and potential damage to her reputation); *Kreutzer v. Clark*, 271 Ark. 243, 607 S.W.2d 670 (1980) (physician was not entitled to a temporary restraining order preventing his termination; alleged harm from loss of his salary and possible necessity of moving to find other employment could be recouped in a court of law by a favorable judgment and an award of damages).

Highlands claims that Garner "relied exclusively on language in *Baptist Health II* that 'physicians are not fungible' for the proposition that irreparable harm must result any time there is a disruption or termination of a doctor-patient relationship." Highlands also contends that Garner failed to present any testimony from patients or otherwise offer any evidence that his patients who had been transitioned or assigned to the department's other

13

radiation oncologists suffered any harm or detriment. Highlands argues that with its plethora of resources, it is well equipped to provide care for the thirty patients that Garner's complaint alleged would be negatively impacted by his departure from Highlands.

Garner responds that this is the exact argument that the Arkansas Supreme Court rejected in *Baptist II*. In that case, Baptist argued that any disruption to patient relationships would be minimal due to the infrequency of the doctors' admissions to Baptist's hospitals, the availability of other physicians, and the common practice of physicians caring for another physician's patients when necessary. The supreme court rejected this argument and agreed with the appellees' position that "while members of a practice group may occasionally cover for each other, physicians are not fungible as to their relationships with patients or their specialties of practice." *Baptist II*, 365 Ark. at 131, 226 S.W.3d at 813. Garner also contends that "given HIPAA protections" and "considerations of basic decency," he could not and would not subpoena his current cancer patients to testify on his behalf.

Highlands thinks *Baptist II* is distinguishable from this case because the plaintiffs there had evidence of "certain and great harm" to their patients; but here, Garner presented only unsubstantiated, hypothetical threats of future harm. Highlands insists that the "non–fungible" language in *Baptist II* was not intended to set aside the requirement of "proof of facts" demonstrating the presence of irreparable harm.

In *Baptist II*, the circuit court found that irreparable harm would result to both the doctors' reputations and to their relationships with their patients. Specific to patients, the circuit court determined that irreparable harm would result from the disruption of the doctors' relationships with their patients and referring physicians and with the doctors'

14

ability to provide proper healthcare to their patients. This is essentially the same reasoning the circuit court applied here to Garner's relationship with his patients facing emotional and life-threatening situations. We disagree with Highlands' position that relying on the language in *Baptist II* means irreparable harm must result any time there is a disruption or termination of a doctor-patient relationship. Each case must be evaluated on its own facts. Here, we hold that the circuit court did not abuse its discretion in finding that Garner's doctor-patient relationships would suffer irreparable harm absent the issuance of the preliminary injunction.

### 3. *Misapplication of* Baptist II

On this point, Highlands repeats its argument that the circuit court erred in finding that Garner's termination would disrupt his relationship with his patients and, citing the language in *Baptist II*, concluding that irreparable harm would result. Highlands again asserts that the circuit court's conclusion runs afoul of the longstanding principle that a showing must be made by proof of facts establishing that a party is entitled to injunctive relief. It reiterates that the net effect of the circuit court's ruling is that "there are no circumstances under which a medical practice can terminate, suspend, or restrict a physician's medical practice if such might conceivably impact that physician's patient relationships, without also, per se, causing irreparable harm sufficient to support a request for injunctive relief." In response, Garner denies that the circuit court made any sort of blanket ruling that any disruption in patient care automatically supports a finding of irreparable harm.

As we have already said, we disagree with Highlands' argument on this point. The circuit court's finding here was based on the particular facts of this case, and there is no

indication that the court treated the language in *Baptist II* as some sort of blanket or categorical rule.

III.

The circuit court did not abuse its discretion in granting the preliminary injunction.

Affirmed.

VIRDEN and BARRETT, JJ., agree.

*Carithers Johnson Devenport, PLLC*, by: *Kelly Carithers* and *Colin M. Johnson*, for appellant.

*Clark Law Firm PLLC*, by: *Suzanne G. Clark* and *Payton C. Bentley*, for appellee.